780 F.2d 213
 UNITED STATES of America, Plaintiff-Appellee,
v.
$10,000 IN UNITED STATES CURRENCY; $26,900 In United States
Currency; Two Gold Bars Stamped 8 Oz. 999.9 Fine, Serial
Nos. C537246 and C428957; and One 18K Gold Identification
Bracelet With No Inscription, Defendants,
Antonia Vega, Claimant-Appellant.
 No. 32, Docket No. 85-6088.
 United States Court of Appeals,
Second Circuit.
 Argued Aug. 29, 1985.
Decided Jan. 2, 1986.
 
 Kurt F. Zimmermann, Asst. U.S. Atty., D. of Connecticut, New Haven, Conn. (Alan H. Nevas, U.S. Atty., New Haven, Conn., of counsel) for plaintiff-appellee.
 David A. Moraghan, Torrington, Conn. (Joseph F. Keefe, Smith & Keefe, Torrington, Conn., of counsel) for claimant-appellant.
 Before MANSFIELD, CARDAMONE, and PIERCE, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 This appeal addresses the troublesome issue presented when objects not particularly described in a search warrant and neither stolen nor contraband are seized in the course of an otherwise legitimate search. The question raised is whether the seizure of this property, constituting proceeds of illegal narcotics transactions, during the execution of a valid search warrant violated appellant's Fourth Amendment rights against unreasonable searches and seizures; and, if so, is the government's action seeking the property's forfeiture therefore void?
 
 
 2
 Antonio Vega appeals from a judgment entered in the United States District Court for the District of Connecticut (Murphy, J.) that declared certain items of personal property forfeited to the United States under 21 U.S.C. Sec. 881(a)(6) (1982).[1] The res which is the subject of this appeal consists of $10,000 in United States currency, $26,900 in United States currency, two eight-ounce gold bars, and one 18k gold identification bracelet.
 
 
 3
 Appellant mounts three challenges to the district court's ruling. First, that the res was not in plain view and not inadvertently discovered, therefore making its seizure a violation of his Fourth Amendment rights. Second, that the illegal seizure should bar the government's subsequent efforts to retain the property through a forfeiture action. Third, that the lower court's findings and judgment are not supported by the evidence.
 
 
 4
 There is no doubt that government agents pursuant to a properly issued and executed search warrant may seize items particularly described in the warrant as the objects to be seized. The items seized here were not described in the warrant, but following a trial, the district court found that discovery of the res resulted from an inadvertent plain view search. It therefore held the res properly forfeitable because it was "from the 'cash and carry' business of a confessed narcotics dealer, Antonio Vega." Under the "plain view" doctrine, incriminating evidence discovered inadvertently during the course of an initially lawful intrusion may be seized. Coolidge v. New Hampshire, 403 U.S. 443, 465-66, 91 S.Ct. 2022, 2037-38, 29 L.Ed.2d 564 (1971) (plurality opinion of Stewart, J.); Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968) (per curiam); United States v. Rollins, 522 F.2d 160, 166 (2d Cir.), cert. denied, 424 U.S. 918, 96 S.Ct. 1122, 47 L.Ed.2d 324 (1975).
 
 
 5
 To rule on this appeal it is necessary to determine the meaning of the word "inadvertent." Webster's Third New International Dictionary defines it as "unintentional" or "heedless". While such definition may aid in our resolution, a dictionary is not a divining rod that unerringly predicts correct legal solutions. When analyzing the plain view doctrine in this context, additional factors must be examined, most significantly the history and purpose of the Fourth Amendment. A thorough analysis of all the factors present in this case persuasively shows that discovery of appellant's property was inadvertent. Hence, we affirm.
 
 
 6
 * Antonio Vega has two apartments--one in Milford, Connecticut and the other in Port Chester, New York. Search warrants were obtained for both. The investigation that led to obtaining the warrants reveals that in 1981 a New York State Police Investigator was assigned to work with the U.S. Drug Enforcement Administration that was looking into cocaine trafficking in Port Chester. An undercover agent purchased cocaine from Vega in Port Chester in September and October, and arranged for a third purchase on December 9, 1981. In addition to these cocaine transactions with Vega, the State Investigator's affidavit in support of the application for the New York search warrant also disclosed information he had received from a female informant who had lived with Vega for a year. She supplied Vega's home address in Port Chester and his apartment address in Milford, which she related was used as a "safe" house and for narcotics deals. She told the investigator that during the past year she had seen in Vega's Port Chester home cocaine paraphernalia and three separate $5,000 stacks of money.
 
 
 7
 In an affidavit for the Connecticut search warrant, the State Investigator outlined the above facts. He further stated that Vega had used the Milford apartment for narcotics purposes as recently as December 7 and 8, 1981 and that the informant had seen a large cocaine press in the Milford apartment, the same one that had been in Port Chester. The affidavit for the Connecticut search warrant contained no reference to money, currency or gold being observed by the informant in Vega's Milford home.
 
 
 8
 As a result of this information, a search warrant for the Port Chester apartment was issued. It authorized government officers to search and seize "quantities of cocaine; equipment used to distribute cocaine including utensils, substances, chemicals, containers, testing equipment and other narcotics paraphernalia; documents regarding said distribution including notes, papers and records; monies and other proceeds of narcotics transactions; property and goods which constitute evidence of or are property designed or intended for use as a means of [violating the narcotics laws]." The search warrant for the Milford apartment was issued by a Connecticut Magistrate. It authorized government agents to search and seize "controlled substances, narcotic trafficking and processing paraphernalia and documents which are evidence of trafficking in controlled substances."
 
 
 9
 On December 9, 1981 after another buy was made by undercover agents from Vega at his Port Chester residence, he was arrested. That same day, government agents executed search warrants at both of Vega's residences. At Milford agents seized 1,431 grams of cocaine found primarily in nine separate ZIPLOC bags in a suitcase found in the bedroom of Vega's minor son. In the child's bedroom closet agents discovered 1,212 grams of marijuana in two clear plastic bags in a black suitcase. In separate containers in the refrigerator's freezer compartment, 59.3 grams and 29.1 grams of cocaine were located. The currency and gold were found in the master bedroom closet in two bank lock-bags, one marked Connecticut Bank & Trust Company and the other Westport National Bank. The investigator testified at trial that he had been advised by the informant of the existence--but not the contents--of these bags.
 
 
 10
 Vega subsequently pled guilty in a separate criminal proceeding and received a sentence of seven years and a fine of $20,000. On November 19, 1982 the United States instituted the present action in rem seeking forfeiture of the seized assets contending that they were the proceeds of illegal transactions.
 
 II
 
 11
 Appellant contends that inasmuch as the Connecticut warrant contained no mention of--much less particularized--authorization to seize assets, monies or other proceeds of narcotics transactions, the search violated the Fourth Amendment's particularity requirement. The seizure of the res was invalid, Vega asserts, because under the law a warrant should be sufficiently precise so that "[n]othing is left to the discretion of the officer executing the warrant." Marron v. United States, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927).
 
 
 12
 The Fourth Amendment states that "[N]o warrants shall issue but upon probable cause ... particularly describing ... the persons or things to be seized." This constitutional mandate is implemented by the return of property provisions of Fed.R.Crim.P. 41(e). The particularity requirement prevents the issuance of general warrants by insuring that a search extends no further than is necessary to find the objects listed in the warrant. Andresen v. Maryland, 427 U.S. 463, 480, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976). Specificity eliminates general searches and prevents the seizure of objects upon the mistaken belief that such action was taken pursuant to a magistrate's authorization. Marron, 275 U.S. at 196, 48 S.Ct. at 76; see generally 2 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment, Sec. 4.6 (1978 and 1985 Supp.). Concededly, the Connecticut warrant--in contrast to the New York warrant--failed to specify all the property that was actually seized when the Connecticut warrant was executed.
 
 
 13
 Yet, appellant's Fourth Amendment rights were not violated because an exception exists for unparticularized objects that are in "plain view" of the searching officers. But, this exception is limited. One of the limitations applicable to the seizure of goods "not contraband nor stolen nor dangerous in themselves" is that these objects in plain view must be discovered inadvertently. Coolidge, 403 U.S. at 470-71, 91 S.Ct. at 2040. Or to state it another way: although a search warrant has not particularly described certain items, they may be seized during a search without violating the Fourth Amendment when they are in plain view, provided they are found "inadvertently." Id. at 465, 91 S.Ct. at 2037. That is to say without premeditation or prior intention.
 
 
 14
 We now address the troublesome scenario of unparticularized objects seized in plain view--where it is claimed that police when obtaining the warrant had some knowledge that the objects would be found. Coolidge explains that any evidence seized under the plain view doctrine must meet a three-pronged limitation. Cases interpreting Coolidge as creating the three-step test applied here include Texas v. Brown, 460 U.S. 730, 737, 103 S.Ct. 1535, 1540, 75 L.Ed.2d 502 (1983) (plurality opinion of Rehnquist, J., but with no judge disagreeing on this issue); United States v. Bonfiglio, 713 F.2d 932, 936 (2d Cir.1983). First, the initial intrusion must be justified by a warrant or by a recognized exception to the warrant requirement. Id. 403 U.S. at 467-68, 91 S.Ct. at 12038-39. Second, the discovery of evidence must be truly inadvertent. Id. 91 S.Ct. at 2040 at 469-70. Third, it must be "immediately apparent" to the police that the evidence inadvertently found incriminates the suspect. Id. at 466, 91 S.Ct. at 2038. "[T]he incriminating nature of an object is generally deemed 'immediately apparent' where police have probable cause to believe it is evidence of crime." United States v. Ochs, 595 F.2d 1247, 1258 (2d Cir.1979); see also Brown, 460 U.S. at 741, 103 S.Ct. at 1542 (no judge disagreeing on this issue); United States v. Chesher, 678 F.2d 1353, 1357 (9th Cir.1982).
 
 A. First Coolidge Limitation
 
 15
 There is no dispute here that the agents presence at Vega's Milford residence was pursuant to a lawfully issued search warrant. They were not engaged in a general, exploratory ransacking of Vega's belongings; but, rather, were searching for controlled substances, narcotics trafficking and processing paraphernalia, and related documents. The search itself was conducted in a reasonable manner, limited to the scope and intensity authorized by the warrant. Terry v. Ohio, 392 U.S. 1, 17-19, 88 S.Ct. 1868, 1877-78, 20 L.Ed.2d 889 (1968) ("The scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible."); Warden v. Hayden, 387 U.S. 294, 310, 87 S.Ct. 1642, 1651, 18 L.Ed.2d 782 (1967) (Fortas, J., concurring). Hence, the first limitation on the plain view exception is satisfied.
 
 B. Second Coolidge Limitation
 
 16
 With respect to the second limitation, Coolidge failed to define the degree of expectation required to make a discovery by the police not inadvertent. The Supreme Court, 1970 Term, 85 Harv.L.Rev. 3, 244 (1971). As part of its doctrinal support for the plain view exception, the Court examined two distinct constitutional protections served by the warrant requirement. One of them is that the requirement of a warrant is intended to eliminate searches not based on probable cause. "[A]ny intrusion in the way of search or seizure is an evil, so that no intrusion at all is justified without a careful prior determination of necessity." Coolidge, 403 U.S. at 467, 91 S.Ct. at 2038 (emphasis in original). The other is to tailor narrowly the scope of the search to the proffered probable cause. "[T]he specific evil is the 'general warrant' abhorred by the colonists, and the problem is not that of intrusion per se, but of a general, exploratory rummaging in a person's belongings." Id. at 467, 91 S.Ct. at 2038. The warrant satisfies this second objective by requiring a "particular description" of the objects to be seized. Id.
 
 
 17
 The Court concluded that the plain view doctrine does not conflict with these twin objectives.
 
 
 18
 [P]lain view does not occur until a search is in progress.... [G]iven the initial intrusion, the seizure of an object in plain view is consistent with the second objective, since it does not convert the search into a general or exploratory one. As against the minor peril to Fourth Amendment protections, there is a major gain in effective law enforcement.
 
 
 19
 Id. Thus, for the inadvertent discovery rule to apply to the present case, it must appear that prior to the issuance of the warrant the police could reasonably and in good faith either have failed to recognize the existence of probable cause or believed that there was insufficient evidence of probable cause to search for the money. See United States v. Wright, 641 F.2d 602, 606-07 (8th Cir.1981); 2 W. LaFave, Sec. 4.11 at pp. 179-83.
 
 
 20
 It would be a mistaken notion to believe that the inadvertent limitation required to sustain the validity of a plain view seizure rests solely on the dictionary definition of the word. Seizures are to be considered in light of the history that gave birth to the language used in the Fourth Amendment. The words employed were a reaction in large part arising from the colonists' abhorrence to general warrants under which a person's home, personal effects and papers could be searched and seized. United States v. Rabinowitz, 339 U.S. 56, 70, 70 S.Ct. 430, 436, 94 L.Ed. 653 (1950) (Frankfurter, J., dissenting); United States v. Travisano, 724 F.2d 341, 344 (2d Cir.1983). Consequently, the "inadvertent" limitation on "plain view" must be read neither to allow a premeditated seizure, nor to prevent effective police work. Fourth Amendment protections should not be construed so broadly that they prevent effective police work. See Coolidge, 403 U.S. at 467-68, 91 S.Ct. at 2038-39 (plain view doctrine justified because major gain to effective law enforcement outweighs minor harm the doctrine does Fourth Amendment rights). Cf. United States v. Leon, --- U.S. ----, 104 S.Ct. 3430, 3431, 82 L.Ed.2d 702 (1984); United States v. Janis, 428 U.S. 433, 447-54, 96 S.Ct. 3021, 3028-32, 49 L.Ed.2d 1046 (1976) (exclusionary rule cases).
 
 
 21
 We examine the degree of expectation required to make discovery inadvertent. A search warrant must be obtained for incriminating evidence which the government believes will be found and for which it has probable cause. Where the police "know in advance" that certain evidence is present and intend to seize it, yet fail to particularize it in their warrant application, their actions "fly in the face of the basic rule that no amount of probable cause can justify a warrantless seizure." Coolidge, 403 U.S. at 471, 91 S.Ct. at 2040.
 
 
 22
 Nevertheless, what the police suspect is not a sufficient basis for obtaining a search warrant. Suspicion does not amount to probable cause. For example, large scale drug traffickers ordinarily have weapons and police may anticipate discovering them when a drug warrant is executed. Such general knowledge simply does not justify issuing a warrant to search a suspect's home for weapons. See United States v. Winston, 373 F.Supp. 1005, 1007 (E.D.Mich.), aff'd, 516 F.2d 902 (6th Cir.1974). Once government agents conduct a search pursuant to a valid search warrant, their earlier suspicions do not make discovery of weapons actually found in plain view premeditated. Nor is the existence of probable cause, unrecognized by the police, sufficient to bar discovery as not inadvertent. Such a purely "objective" approach would exclude important evidence simply because the police "by oversight or acting from an abundance of caution or out of a misapprehension of what it takes to obtain a search warrant covering that evidence, failed to include that item in the warrant executed." 2 W. LaFave, Sec. 4.11 at 181.
 
 
 23
 A doctrinal difficulty of the "inadvertent" seizure concept comes from practical problems arising at the suppression hearing where the burden of proof is turned upside down, that is, the householder must attempt to prove that the police had probable cause to obtain a warrant so that the seizure of his property without it was illegal, while the police must disclaim probable cause in order to make the seizure that they have already effected valid. Such will hardly encourage honest testimony by the police at the hearing. Id. In view of the fact that the householder has no access to police information, a probable cause standard is unsatisfactory. Rather, the district court would have to make an initial finding that the investigation and the seizure of property discovered inadvertently in plain view was conducted in good faith.
 
 
 24
 The focus of the hearing is better directed toward the good faith of the police action when fully viewed. Such includes what the police knew concerning the crime, its elements and means available to prove these elements at the time of the application for the warrant, see Andresen, 427 U.S. at 482-84, 96 S.Ct. at 2749-50, as well as any other relevant circumstance such as, for example, the need for expeditiousness. Of course, even if the police in good faith failed to mention an item in the warrant, the manner in which the search was actually conducted can render discovery no longer inadvertent. Several cases illustrate the latter point. In United States v. Dzialak, 441 F.2d 212, 217 (2d Cir.), cert. denied, 404 U.S. 883, 92 S.Ct. 218, 30 L.Ed.2d 165 (1971), the police spent more than four hours "ransacking" appellant's house "for any possible incriminating evidence." Clearly, whatever was discovered could not objectively be held to have been "inadvertently" discovered in good faith. On the other hand in United States v. Pacelli, 470 F.2d 67, 70-72 (2d Cir.1972), cert. denied, 410 U.S. 983, 93 S.Ct. 1501, 36 L.Ed.2d 178 (1973), we held that the seizure of boric acid, a dilutent for cocaine, under a search warrant specifying only heroin, did not violate the Fourth Amendment. The basis for that conclusion was because there was no evidence that the police had prior knowledge of the boric acid or any intent to seize it prior to discovery. Nor was there any evidence of a rummaging search as in Dzialak. Id. at 71. The police found the boric acid in a shopping bag in plain view in the kitchen.
 
 
 25
 The scope of the search of Vega's apartment more closely resembles the search conducted in Pacelli than the "ransacking" in Dzialak. Further, the trial court had sufficient evidence before it to support a finding that the officers acted in the good faith belief that they did not have sufficient evidence to obtain a search warrant for the money found in the Milford apartment. Although the Investigating Officer had some evidentiary grounds for believing that there might be proceeds in the Milford apartment, it was not as compelling as the evidence with respect to the Port Chester apartment, where a female informant who had lived with appellant for a year supplied specific information regarding money in that apartment.
 
 
 26
 The district court also heard testimony from the Investigating Officer that through this informant, he knew of the existence and location of the bank bags but had no prior knowledge of their contents. He also testified that cocaine was "found in any number of ways," and that "it can be found in a locked bank-bag." The trial court credited this testimony.[2] It also determined that "the agents in looking for more cocaine were within the [Coolidge ] doctrine of 'the inadvertent discovery' of the money and gold during the search of the two bank lock-bags in Vega's bedroom."
 
 
 27
 Thus, where the proof indicates that the police have conducted a thorough investigation of the crime and the means available to prove it and the search is conducted in a manner reasonable in duration and intensity, the property seized may be found to be inadvertently discovered in plain view. In this case, the district court rejected appellant's Fourth Amendment argument based on the record before it which it believed sufficiently demonstrated that the agents were engaged in a concededly valid search when they inadvertently discovered and seized the res. Thus, unless this finding is clearly erroneous, the second limitation of Coolidge has been met.
 
 C. Third Coolidge Limitation
 
 28
 The third limitation on the plain view exception to the particularity requirement is that the police must have had probable cause to believe the evidence they found in plain view, and seized, was evidence of a crime. Brown, 460 U.S. at 734, 103 S.Ct. at 1538; Ochs, 595 F.2d at 1258. The " 'plain view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges." Coolidge, 403 U.S. at 466, 91 S.Ct. at 2038. In the case at bar the officers had such probable cause. They knew Vega was an accused drug dealer who had recently concluded several drug sales with undercover police officers, that the Milford apartment was a "safe" house, that drug dealers usually kept money in "safe" houses and, from professional experience, that drug dealers, more often than law abiding citizens, kept large amounts of cash in their apartments.
 
 III
 
 29
 Having concluded that the "plain view" doctrine made this a lawful seizure of the res, we consider appellant's assertion that the district court's finding of "inadvertency" was clearly erroneous. The standard governing appellate review of a district court's finding of fact is set forth in Rule 52(a) of the Federal Rules of Civil Procedure: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." An appellate court may overrule a district court's findings only if they are clearly erroneous. See Pullman-Standard v. Swint, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982).
 
 
 30
 "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must keep in mind that their function is not to decide factual issues de novo. Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969). "This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." Anderson v. City of Bessemer, --- U.S. ----, 105 S.Ct. 1504, 1513, 84 L.Ed.2d 518 (1985). Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. United States v. Yellow Cab Co., 338 U.S. 338, 342, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949).
 
 
 31
 Anderson outlined the reasons for judicial deference to the trial court's findings of fact. Deference is not limited to questions of credibility where the trial judge is in a better position to observe demeanor. It springs also from a view that there should be an economy of judicial resources. To require the parties--who have already forcused their energies toward persuading a trial court that their version of the facts is correct--now to convince an appellate court of the same proposition is to ask too much of the parties while imposing a "huge cost in diversion of judicial resources." 105 S.Ct. at 1513. Although not limited to findings based on credibility, when the findings of fact are so based, Rule 52 demands even greater deference to the trial court's findings. See Wainwright v. Witt, --- U.S. ----, 105 S.Ct. 844, 854 & n. 9, 83 L.Ed.2d 841 (1985). "[O]nly the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." Anderson, 105 S.Ct. at 1513. Applying these tests, we cannot say that the district court's finding that the res was inadvertently discovered was clearly erroneous.
 
 IV
 
 32
 Because we sustain the finding of the district court that the discovery of the res was the product of an inadvertent plain view search, we need not address the government's argument that the warrant's use of the phrase "evidence of trafficking in controlled substances" included the res and thereby satisfied the Fourth Amendment's particularity requirement. The issue of whether an illegal seizure of assets should act as a bar to the government's subsequent forfeiture action becomes academic in view of our holding that the seizure was lawful.
 
 
 33
 The judgment of the district court is affirmed.
 
 
 
 [1]
 21 U.S.C. Sec. 881(a)(6) states in pertinent part that:
 All moneys, negotiable instruments, securities, or other things of value furnished by any person in exchange for a controlled substance in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter shall be the subject of forfeiture to the United States and no property right shall exist in them.
 
 
 [2]
 The district court also made a finding that "Vega's son told the agents that there were other bags in the father's bedroom" and that the bank lock-bags contained cocaine, in addition to the currency and gold. There is no evidence in the record to support such findings. Nevertheless, such error was harmless and does not disturb our conclusion that it was not clearly erroneous for the district court to apply the plain view doctrine