**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Luz Maria BERRIOS-BERRIOS,**
**Defendant-Appellant.**

**No. 1218, Docket 86–1097.**

United States Court of Appeals,
Second Circuit.

Argued April 23, 1986.

Decided May 23, 1986.

As Amended June 6, 1986.

Stanley A. Twardy, Jr., U.S. Atty., D. Conn., New Haven, Conn. (Albert S. Dabrowski, Asst. U.S. Atty., D. Conn., Hartford, Conn., of counsel), for plaintiff-appellee.

Jacob Wieselman, Hartford, Conn. (Blume, Elbaum & Seidman, Hartford, Conn., of counsel), for defendant-appellant.

Before LUMBARD, MANSFIELD, and MESKILL, Circuit Judges.

LUMBARD, Circuit Judge:

Luz Maria Berrios-Berrios appeals from an order of the District of Connecticut, T. Emmet Clarie, J., mandating Berrios's detention pending trial for federal criminal offenses arising out of a 1983 armed robbery. Judge Clarie, pursuant to a provision of the Bail Reform Act of 1984, denied Berrios's request that he set bail, on the ground that she posed a serious risk of flight. *See* 18 U.S.C. § 3142(e). We have jurisdiction over the appeal pursuant to 18 U.S.C. § 3145(c) and 28 U.S.C. § 1291. Berrios argues that the district court's ultimate decision denying bail is subject to de novo appellate review and was improper; that the court clearly erred in its factual finding that Berrios might flee; that the pertinent provisions of the Bail Reform Act are unconstitutional on their face and as applied; and that the district court erred in admitting the results of electronic surveillance at Berrios's bail appeal hearing. We affirm in part and remand for further proceedings.

On August 28, 1985, a Hartford Grand Jury returned an eight-count indictment against Berrios and 16 other persons, charging offenses stemming from the September 12, 1983 robbery of the Wells Fargo depot in West Hartford, Connecticut. A New Haven Grand Jury filed a superseding indictment on March 21, 1986, which charged 16 of the original 17 defendants with the same, and additional, violations of federal criminal laws; the superseding indictment also added three new defendants. The first indictment charged Berrios with robbery, conspiracy to commit robbery, and

transportation of stolen property. *See* 18 U.S.C. §§ 1951, 1952. The superseding indictment added another count and charge against Berrios: conspiracy to commit interstate transportation of stolen money (18 U.S.C. §§ 2314, 2), to commit armed robbery of a federally insured bank (18 U.S.C. § 2113(a)), and to commit a theft from an interstate shipment (18 U.S.C. § 659), all in violation of 18 U.S.C. § 371.

On April 1, 1986, Judge Clarie continued the detention, which he had previously ordered, of 9 of the defendants charged in the superseding indictment, including Berrios. The judge ordered that all of these defendants be detained without bond pending trial, based on their dangerousness, their risk of flight, or a combination of the two. *See* 18 U.S.C. § 3142(e). The appeals of the eight other detained defendants were consolidated in *United States v. Melendez-Carrion,* 790 F.2d 984 (2d Cir. 1986).[1] Of the remaining ten defendants, five are currently out on bond, two are expected to post bond soon, and three have yet to be apprehended.

Immediately after the grand jury returned the first Wells Fargo indictment the Mexican Federal Judicial Police arrested Berrios on August 30, 1985, in Cuernavaca, Mexico, where she was living with her two children. Berrios and her children were detained in a Mexican jail for three days and, after interrogation, Berrios was brought to the Mexican customs officials, before whom she signed a waiver of extradition. On September 3, the Mexican authorities placed Berrios aboard a Pan Am flight from Mexico City to Miami, where the FBI arrested her.

Berrios was arraigned before United States Magistrate Peter L. Nimkoff of the Southern District of Florida, who subsequently presided over a detention hearing on September 11, 1985. Magistrate Nimkoff set bond at $75,000 unsecured personal surety and $75,000 corporate surety, and gave Berrrios nine days to post bond in Florida before she would have to be removed to the District of Connecticut. Berrios was unable to arrange for the corporate surety, and on September 23 the authorities removed her to Connecticut where, on September 24 and again on October 1, she appeared before Magistrate F. Owen Eagan. On October 1, after Berrios entered a plea of not guilty to the original indictment, Magistrate Eagan adopted the conditions of release set by Magistrate Nimkoff; on that same day, the government appealed Nimkoff's order to the District of Connecticut. *See* 18 U.S.C. § 3145(a).

Judge Clarie held a hearing on October 10, and on October 29 he issued a ruling rescinding and reversing Magistrate Nimkoff's Order of Conditions of Release. Judge Clarie found that Berrios posed a risk of flight, and thus denied bail, pursuant to his authority under the Bail Reform Act. Berrios filed a motion to reconsider and clarify this ruling on November 6, 1985, and a hearing was set for January 9, 1986. Following the hearing and submission of papers, Judge Clarie denied the motion on February 3. Berrios appeals from the rulings of October 29 and November 14, 1985, and February 3, 1986.

Berrios is 36 years old, the mother of two children, and has no previous criminal record. She was born in Naranjito, Puerto Rico, and until recent residence in Mexico had lived her entire life in Puerto Rico. Berrios is married to Juan Segarra Palmer, who is a co-indictee also detained without

---

1. The court in *Melendez-Carrion* remanded the detention pending trial of two of these eight defendants who, because of their "dangerousness," had been denied bail. *See Melendez-Carrion,* at 1004. The court held that preventive detention on the basis of dangerousness was in this case unconstitutional under the fifth amendment's due process clause. *See id.,* at 1000. Consequently, the court ordered that condition of release be set for these two defendants unless, upon remand, the district court found that no combination of conditions could reasonably assure that the two would not flee if released. We consider more fully, *infra,* the implications for the appeal before us of the *Melendez-Carrion* decision.

bail pending trial. *See Melendez-Carrion, supra.* FBI Special Agent Patrick Daly testified at the Florida detention hearing that Berrios was a member of "Los Macheteros" ("The Machete Wielders"), a Puerto Rican organization dedicated to ousting the United States government from Puerto Rico. Los Macheteros has taken credit for a number of violent actions between 1978 and 1983, including murders of American servicemen stationed in Puerto Rico, bombings of United States property in Puerto Rico, and robberies including the 1983 Connecticut Wells Fargo robbery. Special Agent Daly testified that Berrios has been a paid, full-time member of Los Macheteros for eight years, and had gone by the code name "Mima," and that Berrios's husband, Segarra Palmer, has belonged to the organization for at least nine years.

Although Agent Daly conceded that no evidence indicated that Berrios had been present during any of Los Macheteros's violent actions, or that she had been in Hartford at the time of the Wells Fargo robbery, he testified that telephone records showed that there had been pre-robbery conversations between Berrios's home and the Hartford residence of Victor Gerena, a suspected robbery participant. Agent Daly stated that the only evidence directly linking Berrios to the Wells Fargo robbery was an intercepted phone conversation in which Berrios helped to plan a January 6, 1985, giveaway of toys, canned hams, and $20 bills in an impoverished Hartford neighborhood; during the conversation Berrios referred to the robbery by its code name "Aguila Blanca." The government asserted, but offered no proof, that the giveaway was funded with loot from the Wells Fargo robbery.

Agent Daly also testified that in June, 1985, a member of Los Macheteros held a press conference in Puerto Rico to announce that, according to his "sources," the authorities were about to arrest over 100 people in Puerto Rico linked to the independence movement. After the press conference, Agent Daly—who had been keeping Berrios under surveillance—was unable to locate her, her husband, or her children, in Puerto Rico. It turned out that Berrios had moved to Mexico, leaving behind her house and her car. The government argued that the impetus behind Berrios's sudden move to Mexico was her fear of arrest for terrorist activities, and that this demonstrated that she was likely to flee if Magistrate Nimkoff allowed her to remain free on bail.

In setting bail, the Magistrate observed: "There is at the moment nothing before me suggesting furtiveness or flight." He noted that Berrios had been living under her own name in Mexico, and had openly obtained an apartment and bank account in Cuernavaca. He also downplayed Berrios's links to Segarra Palmer and the rest of Los Macheteros, stating "I'm not sure that I should feel that every terrorist's wife is obliged to be in pre-trial detention."

At the hearing upon appeal to the district court (the Connecticut Magistrate having adopted Magistrate Nimkoff's conditions of release), the government supplemented the evidence it had presented in Florida with the testimony of Special Agent Jose Rodriguez, who had monitored many of Berrios's telephone calls in Puerto Rico. These conversations—considered over defense counsel's objection—provided further evidence that Berrios was a member of Los Macheteros, that the organization paid her a salary, and that she knew the details of several crimes and assisted in decisions as to how the stolen money would be spent. Agent Rodriguez also testified that he had intercepted a conversation among four Macheteros in which it was observed that Segarra Palmer intended to flee Puerto Rico with his family, rather than stay in one of the organization's "safehouses" to avoid arrest.

In rescinding the conditions of release and ordering Berrios's detention, Judge Clarie found that the government had shown by a preponderance of the evidence that, if Berrios is released on bail, there is a serious risk that she will flee. Judge Clarie believed that Berrios's sudden relo-

cation from Puerto Rico to Mexico had been for the purpose of avoiding arrest, especially in view of her failure to come to the United States in July, 1985, as she had planned to do. He observed that the intercepted conversations provided strong evidence of Berrios's membership in Los Macheteros, and thus the government had shown that she faced a "significant period of incarceration if convicted," which is a further prerequisite to an outright denial of release on bail.

At the district court's hearing on her motion to reconsider, Berrios attempted to show that she had relocated to Mexico for "legitimate business and educational reasons." Witnesses testified that the move had been planned for some time, and was due to a development in Segarra Palmer's clothing export business. Berrios's sister and others attested, either through testimony or submission of affidavits, to the defendant's fine character; eleven persons who knew Berrios offered their homes as security for any bond the court might set. Berrios's counsel argued, further, that her lifestyle in Mexico undermined the district court's inference that she had fled Puerto Rico: she used her own name in all transactions, she wrote sports news under a byline for a Cuernavaca newspaper, and she openly wrote for references to previous employers in Puerto Rico. Finally, the defense suggested several alternatives to detention pending trial, one of which involved Berrios's relocation to Hartford with both of her children. These two children are currently under psychiatric care in Puerto Rico.

Judge Clarie was not persuaded by Berrios's argument that she had relocated to Mexico for business reasons. He gave more weight to the additional testimony of Agent Rodriguez, who testified that in all the conversations he had monitored from November, 1984, to May, 1985, there had been no mention that Segarra Palmer and Berrios might move to Mexico. The court found that this factor, when combined with Berrios's cancellation of her scheduled trip to the United States, reaffirmed its previous finding that Berrios had gone to Mexico with the motive of escaping arrest. Because Judge Clarie adhered to his belief that Berrios would flee if released on a bond, stating in addition his conclusion that "no conditions of release under bond would adequately assure her appearance at trial," he denied the motion for reconsideration.

■ The Bail Reform Act of 1984 provides that a court can order a defendant's detention pending trial if "no conditions or combination of conditions will reasonably assure the appearance of the person as required." 18 U.S.C. § 3142(e). This provision codified not only the federal case law recognizing the courts' "inherent authority" to preserve their jurisdiction by denying bail in extreme cases, *see United States v. Abrahams,* 575 F.2d 3 (1st Cir.), *cert. denied,* 439 U.S. 821, 99 S.Ct. 85, 58 L.Ed.2d 112 (1978) (*cited at* S.Rep. No. 225, 98th Cong., 2d Sess., 7 n.18), but also the traditional presumption favoring pretrial release "for the majority of Federal defendants." S.Rep. No. 225, 98th Cong., 2d Sess., 6–7, *reprinted in* 1984 U.S. Code Cong. & Ad. News 3182, 3189. Before preventive detention may be ordered under § 3142(e), therefore, the court is obliged to determine both whether the defendant is likely to flee the jurisdiction if released, and whether any conditions of release will be reasonably certain to guard against this propensity to flee. *See also* 18 U.S.C. § 3142(c) (listing possible conditions of release).

■ In reviewing a district court's order granting or denying bail, we apply the clearly erroneous rule to the court's predicate factual findings. *See United States v. Martir,* 782 F.2d 1141, 1146 (2d Cir.1986); *United States v. Chimurenga,* 760 F.2d 400, 405 (2d Cir.1985). Further, a district court's determination that, based on the predicate facts, a defendant poses a risk of flight, should not be disturbed unless it is found to have been clearly erroneous; such determinations are essentially factual and require little, if any, legal interpretation. *See United States v. Melendez-Carrion,* 790 F.2d 984 at 994. Because we do not

harbor the "definite and firm conviction that a mistake has been committed," the district court's finding of risk of flight must stand. *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948); *see Martir, supra*, 782 F.2d at 1146.

■ Berrios argues that, even if the district court did not clearly err in finding that she posed a risk of flight, the court nevertheless erred by failing to consider fully and explicitly whether the government had shown that no condition or combination of conditions would "reasonably assure" her presence at trial if she were released. *See* 18 U.S.C. § 3412(e) and (f). Berrios points out that the district court's obligation to consider all possible alternatives to preventive detention derives from the historical view that bail may be denied only in a "rare case of extreme and unusual circumstances," *Abrahams, supra*, 575 F.2d at 8, and that the presumption in favor of bail still applies where the defendant is found to be a risk of flight, *see Martir, supra; Abrahams, supra; United States v. Ramirez*, 589 F.Supp. 137, 138 (D.Minn.1984). Because these legal and policy standards were explicitly incorporated into the 1984 Act, *see* 1984 U.S. Code Cong. & Ad. News, *supra*, at 3189–90, the court's determination of the viability of alternatives to detention must be, in every case, a mixed question of fact and law. Such questions are subject to flexible appellate review. *See Melendez-Carrion*, 790 F.2d 984 at 994–95; *see also United States v. Hurtado*, 779 F.2d 1467, 1471 (11th Cir.1985) (appellate courts reviewing bail decisions should conduct "plenary" review of mixed questions of fact and law); *see id.* at 1471–73 (citing decisions of six other circuits adopting this standard); *cf. United States v. Rodriguez*, 786 F.2d 472 (2d Cir.1986) (in Title III suppression motion, clearly erroneous rule applies to facts but not to mixed questions of fact and law).

■ In reviewing the district court's determination that no combination of conditions could secure Berrios's presence at trial—upon which depends the ultimate decision to order her preventive detention—we are hampered by the court's failure to explain on the record the extent to which it considered any alternatives to incarceration and, if so, on what basis they were rejected.[2] Consideration of such alternatives is no less important because the district court found that Berrios poses a risk of flight; many courts have set bail for defendants despite their propensity to flee. *See, e.g., United States v. Bigelow*, 544 F.2d 904 (6th Cir.1976) (vacating denial of bail to drifter who threatened the President); *United States v. Wright*, 483 F.2d 1068 (4th Cir. 1973) (affirming grant of bail to accused smuggler with no identifiable roots); *United States v. Soto Rivera*, 581 F.Supp. 561 (D.P.R.1984) (granting bail under strict reporting conditions to defendant charged with bank robbery and murder).

Accordingly, we remand to the district court for further proceedings and such hearing as may be necessary to determine whether any combination of conditions could reasonably assure Berrios's appearance if she were released on bail, and a statement of the reasons for its conclusions. Such exposition will enable us to fulfill our obligation of reviewing the district court's application to its factual findings of the pertinent legal standards contained in the 1984 Act. *See Melendez-Carrion*, 790 F.2d 984 at 994–95; *Hurtado, supra*, 779 F.2d at 1471–73 (citing cases).

■ Berrios also adopts the arguments made by her co-defendants before this court that the preventive detention provisions of the Bail Reform Act are unconstitutional on their face. *See Melendez-Carrion*, 790 F.2d at 996–1004. The court in *Melendez-Carrion* ordered that conditions

2. For example, the district court did not indicate why it found unacceptable Berrios's proposal that, if released on bail, she would remain in Hartford pending trial. In light of Berrios's links to the Hartford community, her seemingly peripheral involvement in Los Macheteros, and the continued detention in Hartford of her husband, this appears to us an alternative not to be lightly dismissed.

of release be set for those Wells Fargo defendants detained because of their "dangerousness," pursuant to 18 U.S.C. § 3142(e), on the ground that such detention violates the fifth amendment's due process clause. *See id.*, at 1003–04.[3] The *Melendez-Carrion* court also held, however, that the Bail Reform Act's provision for pretrial detention based upon the risk of flight was not unconstitutional—it merely codified a traditional and valid procedure employed by the courts. *See id.*, at 997–98. Therefore, because the district court detained Berrios solely because of her alleged propensity to flee, her incarceration pending trial is not facially unconstitutional.

Berrios also argues that, whether or not the district court properly revoked the conditions of release as an initial matter, the sheer length of her pretrial incarceration —8 months at the time of this decision—violates due process.[4] As Berrios points out, the Senate Judiciary Committee feared that lengthy incarceration pursuant to § 3142(e) of the Bail Reform Act might violate a defendant's due process rights; the Committee expected, however, that the Speedy Trial Act's requirement of expeditious trials of detainees, *see* 18 U.S.C. § 3164, would alleviate any constitutional infirmity by ensuring a 90-day "upper bound" on the wait for trial. *See* S.Rep. No. 225 at 22 n.63, *reprinted in* 1984 U.S. Code Cong. & Ad. News, at 3205 n.63. Berrios urges that the protection of the Speedy Trial Act has been nullified in this case because, pursuant to the exceptions for complex tri-

als contained in 18 U.S.C. § 3161(h), the period of pretrial detention for the Wells Fargo defendants has already lasted for eight months, and, therefore, this case presents a situation in which 18 U.S.C. § 3142(e) as applied violates the due process clause.

The government argues that we need not address this constitutional challenge, because the defendants have themselves activated several of the § 3161(h) exceptions to the Speedy Trial Act through their numerous motions and special requests. This view is flawed, however, because the question before us is not the constitutionality of the exceptions to the Speedy Trial Act, but whether eight months of preventive detention, pursuant to 18 U.S.C. § 3142(e), is compatible with due process—the *reason* for the government's delay in bringing the case to trial is only one factor to be considered. Thus, we are squarely presented with the question of whether Berrios's pretrial detention for eight months has, simply because of its length, deprived her of the fifth amendment's due process guarantee.

In *Melendez-Carrion*, we held that the due process clause was not violated simply because the defendants who posed a risk of flight had been incarcerated for over eight months awaiting trial. *See id.*, at 1009. We are of the view that, in all the circumstances of this case, and in light of *Melendez-Carrion*, Berrios's pretrial detention for eight months has not been unconstitutional.

---

3. Although my brothers Chief Judge Feinberg and Judge Newman agreed as to the result in *Melendez-Carrion*, they arrived at the finding of unconstitutionality through different routes. Judge Newman opined that detention for dangerousness is facially unconstitutional because it is imprisonment for crimes not committed. *See Melendez-Carrion*, at 1000. Chief Judge Feinberg, on the other hand, noted in a separate concurrence that he would leave for another day the question of whether the detention for dangerousness provision of the Act was unconstitutional on its face. He believed, however, that the provision violated due process as ap-

plied, because the Wells Fargo defendants had been detained for over 8 months, and that detention for such a period on the basis of dangerousness constituted "punishment." *See id.* at 1009.

4. This argument, which challenges the constitutionality of the risk of flight provision *as applied*, is thus unaffected by the *Melendez-Carrion* court's ruling that the provision is not unconstitutional *on its face*.

■ The consequences of a ruling to the contrary are plain and would be unacceptable. First, Berrios does not dispute that the government has complied with the Speedy Trial Act. It so happens, however, that because of the complexity of the Wells Fargo case—which involves 19 defendants, numerous criminal charges, and much electronic evidence in Spanish—the government has been unable to bring this case to trial, and has been forced to invoke the exceptions listed in § 3161(h). *Compare United States v. Fox*, 788 F.2d 905 (2d Cir.1986) (dismissing indictment because unexplained five-month trial delay violated Speedy Trial Act). This delay has been exacerbated by the defendants' many motions. Second, it may happen that the district court on remand will adhere to its view that Berrios not only poses a risk of flight, but also that no conditions would secure her presence at trial if she were released. If we were to hold that eight months of preventive detention is unconstitutional because of its length, even in a case presenting the facts as posited, then we would essentially be informing the government that it could *never* be assured of bringing to trial certain defendants in certain kinds of complex cases—unless it kept them under constant surveillance throughout the pretrial period. This we are unwilling to do.[5]

■ Finally, Berrios argues that the government violated 18 U.S.C. § 2518(9) by introducing, at her bail hearing in the district court, the results of electronic surveillance without having provided Berrios or her counsel with the supporting documents, or with transcripts, at least ten days prior to the hearing. The government correctly notes, however, that most of these materials (over 2,000 pages of transcript) had been used previously in the Florida hearing before Magistrate Nimkoff; Berrios's counsel in Florida, Alan Ross, had had adequate opportunity to review the supporting documents. Although Berrios's new counsel, Jacob Wieselman, received these Florida materials only one day before the Connecticut hearing, they had been available to the defense team for over a month. In these circumstances, we think that any prejudice to Berrios from introduction of the Florida materials at the Connecticut hearing was small and, in any event, could have been avoided by her counsel; we think that these materials were properly admitted.

As to the remainder of the surveillance results introduced at the Connecticut hearing (32 pages of transcript), it was new evidence, not offered in Florida, and was not provided to Wieselman until the morning of the hearing. Berrios is correct that she or her counsel should ordinarily have received the materials supporting this new evidence at least ten days in advance of the Connecticut hearing. 18 U.S.C. § 2518(9). The district court excused, however, the application of the ten-day requirement, apparently concluding after its colloquy with counsel (1) that the government had been unable to furnish Berrios with the information within the statutory period, and (2) that Berrios had not been prejudiced by her late receipt of this small amount of materials. *See* 18 U.S.C. § 2518(9). Under all the circumstances, the district court did not abuse its discretion in admitting the additional surveillance evidence.

In sum, we affirm the district court's finding that Berrios poses a risk of flight, but remand for such hearing as may be necessary to reconsider whether, despite this propensity, there are any viable alternatives to her continued detention pending trial. Whatever the district court ultimately decides, it should explicate the reasons underlying its conclusion so that we may conduct meaningful review. We find, also, that Bail Reform Act's provision for pre-

---

**5.** We do not address today the question of whether preventive detention because of the risk of flight can be constitutional no matter how long, or in what circumstances, the defend- ant has been detained. The validity of detention for risk of flight must be determined on a case-by-case basis, taking into account all the factors surrounding the detention.

ventive detention based on the risk of flight is constitutional on its face, because it simply codifies the courts' traditional exercise of their "inherent powers." Further, we hold that eight months of pretrial detention is not unconstitutional solely because of its length, and that the application to Berrios of the Bail Reform Act's risk of flight provision has to date been valid.

We note that there is an additional reason for immediate reconsideration of Berrios's continued detention. No trial date has been set. The government advised us at oral argument on April 23, 1986, that the district court had indicated that trial could not begin until sometime in September, at the earliest. Thus, Berrios faces the possibility of detention for more than one year. Unless it is clear that her appearance cannot reasonably be assured short of detention, there would be a serious due process problem in continuing her custody. Further proceedings should be had without delay; any appeal from an order of the district court will be expedited upon request. We retain jurisdiction.

Affirmed in part and remanded for further proceedings.

MESKILL, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's rejection of Berrios' constitutional challenges to the pretrial detention statute and its affirmance of the district court's admission of electronic surveillance evidence. I dissent from the majority's decision to remand this case for further proceedings, however, because it represents a departure from precedent and calls for a determination that the experienced district judge has already made.

Prior to our recent decision in *United States v. Melendez-Carrion*, 790 F.2d 984 (2d Cir.1986), a case involving Berrios' co-defendants, it was settled in this Circuit that a district court's findings with respect either to a pretrial detainee's risk of flight or to the detainee's dangerousness would not be disturbed unless clearly erroneous. *Id.* at 994 (citing *United States v. Martir*,

782 F.2d 1141, 1146 (2d Cir.1986); *United States v. Colombo*, 777 F.2d 96, 100 (2d Cir.1985); *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir.1985)). In *Melendez-Carrion*, we noted that because dangerousness "is not as clear a concept as risk of flight and has not been fully developed as a basis for pretrial detention," it may require a broader scope of review than risk of flight entailing both factual determinations and legal interpretation. 790 F.2d at 994. On the other hand, we said, not only does the clearly erroneous standard apply to "the ascertainment of historical facts underlying the conclusion that the defendant is a risk to flee" but also "[t]he *ultimate determination of risk of flight* would normally seem to be as subject to the 'clearly erroneous' standard of review as the underlying historical facts." *Id.* (emphasis added); *see also id.* at 995, 1004–05 (affirming detention orders based on findings of risk of flight which were "adequately supported by the evidence").

The "ultimate determination" of risk of flight in a pretrial detention case necessarily and logically includes the subsidiary, essentially factual question of whether the various possible conditions of release are likely to assure the appearance of the defendant at trial. In this case, Judge Clarie reviewed the conflicting evidence regarding Berrios and then made the explicit factual determination "that she represented such a high risk of flight that no conditions of release under bond would adequately assure her appearance at trial." J.App. at 122. Less than a month after *Melendez-Carrion*, the majority treats that ultimate determination as a mixed question of law and fact, subject to a less deferential standard of review. So much for *stare decisis*.

There certainly was evidence from which Judge Clarie could have found that Berrios had fled to Mexico in the face of imminent arrest, that she had the means and inclination to do so again, and that various proposed conditions of release would not prevent her from fleeing. There was also evidence to the contrary. However,

"[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *see also United States v. $10,-000 in United States Currency*, 780 F.2d 213, 220 (2d Cir.1986).

Because Judge Clarie has already determined that no conditions of release will reasonably assure Berrios' presence at trial, I do not join the majority in directing him to make this determination again. Nor do I presume, as the majority seems to do, that Judge Clarie was unaware of the important liberty interests that were at stake when he made the determination. Because Judge Clarie's ultimate finding with regard to Berrios' risk of flight was not clearly erroneous, I would affirm.