UNITED STATES of America

v.

Manuel RIVERA, a/k/a "Nector Galarza," a/k/ "Nester," Maximino Ramirez, a/k/a "Cookie," Domingo Torres, a/k/a "Dominic," David Lopez, Rafael Melendez, a/k/a "Nestali," Petra Vila Mathaus, Olga Galarza, Ramon Gonzalez, a/k/a "Moncho," Julio Perez Cestero, a/k/a "Julio Perez Cestaere", a/k/a "Julito" and Jane Doe, a/k/a "Elena," Defendants.

No. 78 Cr. 0640 (KTD).

United States District Court,
S. D. New York.

Jan. 12, 1979.

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., New York City, for the U. S.; Patricia Anne Williams, Asst. U. S. Atty., New York City, of counsel.

Stuart R. Shaw, New York City, for defendant Manuel Rivera, of counsel.

Ralph S. Naden, New York City, for defendant Maximino Ramirez, of counsel.

Joseph T. Klempner, New York City, for defendant David Lopez, of counsel.

Gilbert Epstein, New York City, for defendant Olga Galarza, of counsel.

Louis R. Aidala, New York City, for defendant Ramon Gonzalez, of counsel.

## OPINION AND ORDER

KEVIN THOMAS DUFFY, District Judge:

The Grand Jury, in a two-count indictment, filed September 11, 1978, charged the defendants, Manuel Rivera, Maximino Ramirez, Domingo Torres,[1] David Lopez, Rafael Melendez, Petra Vila Mathaus, Olga Galarza, Ramon Gonzalez, Julio Perez Cestero and Jane Doe (later identified as Maria Elena Zea-Carpio,) with conspiring to import and distribute a large quantity of heroin, in violation of a variety of the federal narcotics laws.[2]

Defendants Rivera, Lopez, Galarza and Ramirez have separately moved to suppress certain evidence originally seized by New York State law enforcement officials. In addition, defendants Rivera and Lopez have moved to dismiss the indictment on the ground that by virtue of prior prosecutions they are faced with double jeopardy for the same offenses charged in the instant indictment.[3]

---

1. When the indictment in the instant case was handed down the defendant, Domingo Torres, was named as a defendant in a similar drug conspiracy case assigned to Judge Owen of this Court. Thereafter, the defendant decided to enter a plea of guilty to the charges in both actions before Judge Owen. This was done and he is presently awaiting sentencing as a result of his plea.

2. In particular, the indictment charges that the defendants conspired to import heroin and cocaine into this country, in violation of 21 U.S.C. §§ 951, 952, 960, with intent to distribute said drugs in violation of 21 U.S.C. §§ 812, 841(b)(1)(A), (b)(1)(B).

3. The defendants have also made numerous other motions which are as follow: Rivera has also moved for an order granting him an opportunity to inspect the Grand Jury minutes surrounding the instant indictment, a motion for a further Bill of Particulars of the indictment which the government has, to date, objected to providing, a severance and dismissal of the indictment because of an alleged violation of the Speedy Trial Act, 18 U.S.C. §§ 3161–74; Olga Galarza has also moved for a severance and a continuance for purposes of locating cer-

## I. Suppression

A lengthy suppression hearing was held before me commencing December 18, 1978 and terminating on December 22, 1978. The following constitute my findings of fact and conclusions of law.

### A. Rivera and Galarza

In the latter part of 1976 the defendant, Manuel Rivera, was sought by the New York City Police Department as a suspect in connection with multiple homicides in the Bronx and in Queens. All efforts to locate Rivera had proved futile. It was not until October 25, 1976 that the police learned, through a confidential informer, Benny Escobar, that Rivera was living with his common law wife Olga Galarza, a co-defendant in this action, in a Bronx apartment located at 1383 Bronx River Avenue. Escobar also corroborated much of the information the homicide detectives had pieced together concerning Rivera's involvement in the murders. In light of Escobar's apparent reliability, the detectives decided to immediately place the Rivera/Galarza apartment under surveillance. Once it was determined that Rivera resided therein, they would place him under arrest.

As it turned out, however, just hours before the surveillance and anticipated arrest of Rivera, Escobar volunteered additional information, tangential to the homicide investigation, linking Rivera with a large narcotics operation in the Bronx. In fact, Escobar stated that the homicides in issue were actually the by-product of the narcotics operation in which Rivera occupied a prominent position. Furthermore, the detectives were told that Rivera was presently storing a large quantity of heroin in his apartment at 1383 Bronx River Avenue. At this point, an Assistant District Attorney called in the Bronx Narcotics Unit and set the wheels in motion for securing a search warrant of the Rivera apartment as soon as possible.

The surveillance of the Rivera apartment began the next morning as scheduled, however, in light of the recent developments it was decided that rather than entering the apartment to arrest Rivera they would simply maintain surveillance of the apartment. This would enable the homicide detectives to monitor Rivera's movements while the Narcotics Unit secured a search warrant. To this end, Detectives Marsenison and Paul, of the Homicide Division, were stationed outside of 1383 Bronx River Avenue. From their vantage point they observed Rivera exit the building and drive off with another individual, later identified as Sixto Mayi. The detectives followed the Mayi vehicle and, after two brief stops, at an auto body shop and a restaurant, the car headed for the Sheridan Expressway. Paul and Marsenison decided to stop the vehicle before it entered the expressway and proceeded to force it to the side of the expressway entrance ramp. The detectives approached the vehicle, carrying shotguns and calling out that they were police. A gun battle ensued with Rivera shooting a pistol at the officers while Mayi backed the car at great speed off the entrance ramp. Detective Paul fell to the ground wounded in the crossfire. After helping Paul to their vehicle, Detective Marsenison attempted to follow the car in which the defendant Rivera was a passenger but that vehicle was lost from the detectives' view. Accordingly, the detectives retraced their steps, first to the restaurant then to the auto body shop and finally back to the Rivera/Galarza apartment. There Paul was turned over to uniformed police who were present pursuant to an "Assist Officer" call. Thereafter, Detective Marsenison knocked on Rivera's door and was admitted by Olga Galarza.[4]

Defendants Galarza and Rivera both allege that upon entering the apartment, Marsenison conducted a full search thereof

tain witnesses crucial to the presentation of her case;

David Lopez has also moved for a severance. These motions, save the motions for severance, will be dealt with in the course of this opinion.

I will reserve decision upon the severance motions until the day of trial.

4. Also present in the apartment at this time were Saul and Sara Lopez and Ms. Galarza's infant.

without a warrant and without the consent of Ms. Galarza. They further assert that it was at this point that a red suitcase containing three pounds of heroin and a pistol were seized and only later, in an effort to cure an initially defective search, was a search warrant secured.

Alternatively, defendants argue that even if a warrant was secured prior to a full search of the apartment, it was not issued on probable cause and was therefore defective.[5] I find, however, that the totality of credible evidence does not support either of defendants' allegations.

It is undisputed that upon losing sight of the Mayi vehicle on October 26, 1976, Detectives Paul and Marsenison returned to the Rivera/Galarza apartment where they were joined by Detectives Trainer, Power and Howard—all members of the Eighth Homicide Squad. It is at this point, however, that the facts are bitterly contested.

■ Much was made of the fact that Ms. Galarza neither speaks nor understands English. It was argued that upon returning to the apartment Marsenison and the other homicide detectives initially gained entrance thereto without Ms. Galarza's consent. It was argued that they intimidated Ms. Galarza into opening the door. Even assuming this to be true,[6] I find that nothing was seized by the detectives at this point and, therefore, there is nothing to be suppressed.

It was apparent from the testimony at the hearing that the detectives, with or without consent, merely conducted a walk-through search for defendant Rivera. This search consisted of looking in each of the rooms, closets and under the beds. There is simply nothing credible· to indicate that upon this initial entrance a full search of the apartment was conducted. Indeed, the totality of evidence and logic both compel the contrary conclusion. The homicide detectives knew that the narcotics unit was in the process of securing a warrant authorizing a full search of the premises. It was established that upon learning of the presence of narcotics in the Rivera/Galarza apartment, the investigation became a joint operation between the narcotics and homicide unit. There is no reason to believe, or evidence to suggest that the homicide detectives would risk an illegal seizure at this point in the investigation. Moreover, the unanimous testimony of those detectives of the narcotics unit who went to the apartment later that day armed with a valid search warrant, Detectives Brady and Coursey, was that before executing the warrant they established, by questioning the homicide detectives present in the apartment, that the premises had not been searched. They also testified that upon entering the apartment and a visual inspection thereof everything was in order and it was clear to them that no prior search had taken place. There is no reason to doubt their testimony and I find it dispositive of this issue.

The balance of defendants' arguments focus upon the role played by the confidential informant, Benny Escobar, in securing a search warrant for the Rivera/Galarza apartment.

It was upon the affidavit of Detective Kevin Coursey, dated October 26, 1976, that the search warrant was issued for the Rivera/Galarza apartment located at 1383 Bronx River Avenue. The defendants' contest, however, the reliability of the confidential informant who was the source of

---

**5.** While defendant Rivera does not specifically make this argument in the alternative, in light of the circumstances surrounding the search, I will deem the motion made by Rivera and Galarza.

**6.** There was no evidence offered to indicate that Ms. Galarza opened the door to the detectives out of fear. Moreover, it was established that detective Marsenison spoke Spanish and indicated to Ms. Galarza the nature of their investigation and why they wanted to look in-

side the apartment. I also find that it was this conversation between Marsenison and Galarza which prompted her to accompany the detectives to the precinct house after it was established that Rivera was not in the apartment. Indeed, Marsenison testified that when Galarza realized the serious nature of the investigation by the homicide detectives she demonstrated a willingness to assist them and voluntarily accompanied them to the police station.

the information contained in the Coursey Affidavit. They argue that the affidavit was insufficient in that it failed to state on what basis the informant could be judged to be credible or his information reliable by the issuing Magistrate.

■ It is now settled that the constitutional requirement of probable cause can be satisfied by hearsay information. *Aguilar v. Texas,* 378 U.S. 108, 114, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). It is equally as clear, however, that where the hearsay is that of a confidential informant not personally before the issuing Magistrate, as in the case at bar, the affiant must set forth the basis of the informant's information and demonstrate that the informant is credible or his information reliable. *Spinelli v. United States,* 393 U.S. 410, 413, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas, supra.*

■ Upon review of the Coursey Affidavit, I find it sufficient to establish both the basis of the informant's information and the reliability of his information. Indeed, the affidavit states that the informant's information concerning the presence of narcotics was based upon personal knowledge and that prior information supplied by him led to at least one arrest and one narcotic's buy in the past. Moreover, Officer Coursey gave oral testimony before the issuing Magistrate which more fully set forth the basis of the informant's information as well as demonstrating his credibility and the reliability of his information.

Accordingly, defendants' Rivera and Galarza's motions to suppress must be denied.

### B. *Lopez*

In March of 1977 the defendant, David Lopez, was indicted by a California Grand Jury for violations of the federal narcotics laws. Thereafter, as a result of an investigation, it was learned that prior to his indictment Lopez had been living in an apartment with one Martha Diaz at 1485 Macombs Road in the Bronx. As a potential witness in the Lopez trial Ms. Diaz was interviewed in late March by Officer Kenneth Robinson of the New York Drug Enforcement Task Force.

In the course of the interview, Ms. Diaz told Officer Robinson that Lopez no longer resided in the apartment and she had no idea where he was presently residing. She went on to say, however, that Lopez had left certain personal effects in the apartment. She then voluntarily turned the items over to the Officer, which included a "travel diary." It is the introduction of this travel diary that Lopez seeks to suppress in the instant motion.

The defendant argues that he was in fact living with Ms. Diaz prior to his arrest and the apartment was, at the time of the "seizure," his permanent residence and, consequently, he had a proprietary interest therein. He further argues that if Ms. Diaz voluntarily turned the travel diary over to the police she did so without his consent or a waiver of his consent. He concludes, therefore, that the seizure of the diary was violative of his fourth amendment rights and it must be suppressed.[7] I disagree.

■ It is clear that where the government seeks to justify a warrantless seizure, as in the instant case, by proof of voluntary consent, it is not restricted solely to consent given by the defendant but rather may prove consent, sufficient to justify the seizure, by a third party "who possessed common authority over or other sufficient relationship to the premises or effects" seized. *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1973).

---

7. The totality of evidence offered surrounding the travel dairy indicated that prior to the visit of Officer Robinson to the Diaz apartment, Ms. Diaz had requested that Lopez move out of the apartment. It could be argued, therefore, that the defendant no longer had a proprietary interest in the apartment (or a reasonable expectation of privacy therein—*see Katz v. United States,* 389 U.S. 347, 353, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)) and the diary was merely abandoned property subject to seizure upon the consent of the tenant Ms. Diaz. *See Abel v. United States,* 362 U.S. 217, 240–41, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960).

In light of my holding concerning the diary, I need not rest my decision, however, solely upon the theory of abandonment.

The uncontroverted evidence establishes Ms. Diaz's dominion and control not only of the premises at 1485 Macombs Road, but also over the travel diary itself. As the lawful tenant of the premises Diaz clearly had authority to consent to a search of her premises even assuming Lopez still resided therein. See *United States v. Isom*, 588 F.2d 858 at 860 (2d Cir. 1978). More importantly, however, Officer Robinson testified that while the diary belonged to Lopez, Ms. Diaz had been permitted to make a number of entries therein. I find this demonstrates sufficient common authority over the travel diary to have permitted Ms. Diaz to voluntarily consent to its seizure. *United States v. Matlock, supra*, 415 U.S. at 171, 94 S.Ct. 988.

### C. *Ramon Gonzalez*

The defendant, Ramon Gonzalez, seeks in his motion to suppress certain items seized as a result of a search of his apartment as well as all pre-trial identifications of him sought to be introduced by the Government in this action.

The facts concerning the search of the Gonzalez apartment, essentially undisputed, are as follow: In January, 1977, agents of the Bronx Narcotics Unit were told by a confidential informer of a large narcotic's operation working from an apartment building located at 752 Gerard Avenue in the Bronx and, more particularly, from apartment 46–A of that building.

Upon examination of the confidential informer by Officers Frank Morosco, now deceased, and Frank Morelli, Morosco applied for a search warrant of apartment 46–A at 752 Gerard Avenue. Thereafter, a warrant was issued for that address and executed on January 20, 1977. The search produced a quantity of heroin and a fully-loaded magnum pistol.

The defendant argues that the search warrant executed on January 20, 1977 was void in that the defendant's apartment, which was searched, is located not at 752 Gerard Avenue, but rather at 751 Walton Avenue. This, he charges, renders the warrant fatally defective and mandates suppression of the evidence seized therein. Alternatively, however, he argues that even if this address defect is not a fatal defect, the warrant was issued on less than probable cause and is thereby void.

The main entrance of the building housing the Gonzalez apartment bears the address 751 Walton Avenue. The rear of this building, however, faces Gerard Avenue. Moreover, the testimony revealed that looking at the building from Gerard Avenue, the only number visible is that of 752 which is positioned over a Spanish American restaurant. It was clear from the testimony that this restaurant is actually part of the same building which contains the Gonzalez apartment. Indeed, there are apartments above the restaurant which are part of the same complex containing the Gonzalez apartment. Moreover, the Department of Buildings of the City of New York lists the premises at 751 Walton Avenue and 752 Gerard Avenue as being one in the same building. I find, based upon the papers before me and the testimony elicited at the hearing, that the warrant specifying apartment 46–A located at 752 Gerard Avenue correctly described the Gonzalez apartment.

Even assuming, however, that 752 Gerard Avenue were a separate and distinct address, this would be a mere technicality and under the circumstances surrounding the instant search, it is not a fatal defect. It is clear that concerning the sufficiency of the description of premises to be searched, the test is one of reasonableness and elaborate specificity is not required. *United States v. Freeman*, 532 F.2d 1098, 1100 (7th Cir. 1976); *United States v. Campanile*, 516 F.2d 288, 291 (2d Cir. 1975). Accordingly, where the description of the premises to be searched was sufficient to enable those executing the warrant to locate and identify the premises, with reasonable effort, the requirements of the fourth amendment are satisfied. *United States v. Campanile, supra*, 516 F.2d at 291.

The record is replete with evidence indicating that the police knew exactly

which building and apartment therein was the subject of the search. There is simply no indication that there existed any confusion as to the premises to be searched. Thus, the description set forth in the warrant, even if technically incorrect, was sufficient under the circumstances of this case to satisfy the fourth amendment.

■ Turning briefly to defendant's attack upon the use of a confidential informant in order to secure a search warrant of his apartment, I find such use well within the parameters enunciated by the Supreme Court in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). Indeed, the affidavit of Officer Moresco sets forth with incredible detail not only the numerous personal observations by the informant of illegal drug trafficking emanating from the apartment in issue, but also information given by the informant in the past and the fruits thereof—evidencing his credibility and the reliability of his information.

Defendant next challenges two separate photo arrays which included the defendant and from which he was identified by at least two persons.

■ A pre-trial photo identification will be suppressed only where the identification procedures were unnecessarily suggestive and conducive to irreparable mistaken identification. *Neil v. Biggers,* 409 U.S. 188, 196, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

■ The two photo presentations in issue consist of a loose-leaf binder containing some 480 photographs and 45 loose photos of persons known or suspected of involvement in narcotics.

Upon extensive testimony it is clear that there is nothing suggestive about the photos themselves or the way in which they were displayed by the officers involved. On the contrary, the testimony evidenced a fair and quite neutral presentation of the photos in issue.

Defendant bases his argument in part on the fact that a number of the photos in the loose-leaf binder, including one of the defendant Gonzalez, were removed after being identified. It was established, however, that this loose-leaf book was an on-going photo display and the photos contained therein were periodically changed. There was no evidence that the missing photographs somehow constituted an overly suggestive display. On the contrary, there was testimony by the police officer who compiled the book that these missing photos were, for all intent and purposes, identical in their presentation to the remaining photos. Upon examination, I find that both photo displays were properly used by the law enforcement officials involved.

Accordingly, defendant Gonzalez's motion to suppress the items seized from his apartment as well as the pre-trial photo identifications of him is denied.

### D. *Ramirez/Rivera*

After the shooting incident involving defendant Rivera and Sixto Mayi on October 26, 1976, the police were unable to locate Rivera. The investigation of Rivera which followed, however, did lead to the disclosure of a number of other individuals involved not only in the narcotics operation, but also in the multiple homicides under investigation. One such individual to emerge was Maximino Ramirez.

In the late hours of November 24, 1976, detectives of the Bronx Homicide Squad were given a tip that both Rivera and Ramirez would be at a social club located on 119th Street shortly after midnight. A mobile unit was immediately sent to investigate. Thereafter, the unit reported to the rest of the squad, now enroute to the social club, that the two suspects had been seen with two other individuals in a green 1970 Ford Station Wagon, license number 472 WVB, in the vicinity of East 125th Street and First Avenue heading towards the Willis Avenue Bridge. The mobile units, four in number, were able to stop the vehicle at the foot of the bridge. The officers then approached the vehicle and visually identified two of the occupants as Rivera and Ramirez. The four individuals were or-

dered out of the car and patted down for weapons. Weapons were removed from Rivera and Ramirez and both individuals were placed under arrest. In the course of effecting these arrests the officers noticed certain items in the rear of the station wagon. These items were also seized at this time.

Rivera seeks to suppress both the weapon seized at his arrest and the items seized from the back of the vehicle he was riding in. He charges that they were seized in violation of his fourth amendment rights. The motion, in all respects, must be denied.

■ It cannot realistically be disputed that in the early hours of November 25, 1976, the police officers from the Bronx Homicide Squad had probable cause to arrest Rivera. Indeed, Detectives Paul and Marsenison, both present on the 25th, were personally involved in a shooting incident involving Rivera and were aware of the quantity of narcotics recovered in his apartment soon thereafter. Thus, in the course of effecting this valid arrest [8] the detectives were well within the confines of the fourth amendment by conducting a limited weapons search of Rivera. *See, e. g., Preston v. United States,* 376 U.S. 364, 367, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964).

■ Concerning the items seized from the car it is apparent that Rivera lacks standing to attack the seizure. It was established in the course of the hearings that the 1970 green station wagon belonged to one Ada Ramirez—wife of Maximino Ramirez. Rivera has failed to demonstrate that he had any proprietary interest either in the car or the items seized. Accordingly, he lacks a reasonable expectation of privacy in the vehicle and the goods seized therein and is without standing to challenge the seizure. *Rakas v. Illinois,* —— U.S. ——, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

■ Turning to Ramirez, a different analysis yields the identical result. He, like Rivera, was the subject of a homicide inves-

tigation conducted by the Bronx Homicide Squad at the time of his arrest in November. Thus, upon receipt of the tip that he was in a social club and the subsequent report from one of the mobile units that both he and Rivera were traveling in a green station wagon, there existed sufficient grounds to stop the vehicle initially. Thereafter, upon the visual identification of Rivera and Ramirez by some of the police officers at the scene, there was sufficient basis for an extended detention of the vehicle. Moreover, upon the arrest of Rivera the officers were permitted, for purposes of their own safety, to check the other occupants for dangerous weapons. Thus, the seizure of the gun from Ramirez was proper and will not be suppressed.

■ Turning to the items seized in the back of the station wagon, these items were in plain view when Rivera and Ramirez were placed under arrest and, accordingly, were properly seized in connection therewith.

Accordingly, the motions of Rivera and Ramirez to suppress the weapons seized as well as the items seized from the station wagon on November 25, 1976 are denied.

## II. Double Jeopardy

### A. *Rivera*

■ As a result of the October 26th search of the Rivera/Galarza apartment, and the seizure of three pounds of heroin therein, Olga Galarza was placed under arrest for violations of New York's narcotics laws. Thereafter, on November 25, 1976, Rivera was arrested by Bronx Homicide detectives, and subsequently indicted in the Bronx and Queens on multiple counts of homicide. Rivera pleaded guilty to both indictments.

Rivera charges that he was promised, by certain unidentified individuals, that if he pled guilty to the Bronx and Queens homicides, the drug charges against his wife Olga would be dismissed and that his pleas

---

8. It cannot be disputed that the police had probable cause to arrest Rivera that night and that in light of the exigent circumstances—his prior flight from the authorities and his presence in a moving vehicle, his arrest was reasonable even absent an arrest warrant.

would "cover and satisfy" any open drug charges against him. He argues that in spite of his guilty pleas, the instant prosecution is based upon the identical drug charges intended to be "covered and satisfied" thereby. He concludes, therefore, that the instant prosecution has the effect of twice placing him in jeopardy for the same offense in violation of the fifth amendment.

Even assuming, for purposes of the instant motion, that defendants' pleas were intended by all parties to the Bronx and Queens actions to include the same transactions which are the basis of the instant indictment, this alone would not amount to double jeopardy. Indeed, successive state and federal prosecutions for the same criminal transactions have long been held not to constitute double jeopardy. *Abbate v. United States,* 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1958); *United States v. Lai Ming Tanu,* 589 F.2d 82 at 88 (2d Cir. 1978).

Moreover, the record is void of any federal participation either in the Bronx or the Queens homicide prosecutions. *Abbate v. United States, supra,* 359 U.S. at 190 n.4, 79 S.Ct. 666. Consequently, I can find no basis in fact or law sufficient to permit Rivera to rely upon the doctrine of double jeopardy.

Accordingly, Rivera's motion to dismiss the indictment on the grounds that it constitutes double jeopardy is denied.

### B. *Lopez*

Defendant Lopez also alleges that by virtue of the instant indictment he has twice been placed in jeopardy for the same offense in violation of the fifth amendment. He argues that his prior indictment, by a Federal Grand Jury in California, and his subsequent plea of guilty thereto, was for the same criminal transactions covered in the instant indictment. He concludes, therefore, that the instant indictment should be dismissed as to him.

The defendant grounds his double jeopardy argument in the existence of a number of similarities between the prior California indictment and the instant indictment. In particular Lopez alleges that:

(a) Both indictments charge a conspiracy to violate the federal narcotics laws; [9]

(b) both indictments involve the drug heroin;

(c) the time period covered by the California indictment is wholly subsumed into the time period charged in the instant indictment;

(d) one of Lopez's co-defendants in the California action appears as an unindicted co-conspirator in the instant indictment;

(e) both indictments cover acts taking place in the cities of New York and Los Angeles; and

(f) the intended use by the government in the California prosecution and the instant action of a travel diary as evidence of defendant's alleged narcotics violations.

Based upon the above similarities the defendant concludes that dismissal of the instant indictment is mandated based upon the doctrine of double jeopardy. I disagree.

Traditionally in this Circuit, a determination of whether two prosecutions are the same for purposes of invoking the doctrine of double jeopardy has been made by rigidly applying the "same evidence test": by examining whether the evidence required to support a conviction in one prosecution would be sufficient to support a conviction in the other. *United States v. McCall,* 489 F.2d 359, 362–63 (2d Cir. 1973), *cert. denied,* 419 U.S. 849, 95 S.Ct. 88, 42 L.Ed.2d 79 (1974). The rigid application of this test, however, has recently come under attack especially in the context of a large narcotics conspiracy case. Indeed, the need for a more fluid test is even more pronounced where, as in the case at bar, the first prosecution consisted merely of a guilty plea before a full trial. This situation requires

**9.** While both indictments do involve a conspiracy to violate the federal narcotics laws, the California indictment also involves a number of substantive counts not appearing in the instant indictment. This is some evidence that the conspiracies in issue are in fact separate and independent.

the trial judge in the second action to rely predominately upon speculation as to what evidence would have been sufficient in the first trial, had one taken place, to support a conviction therein. Then, he must compare this with the evidence of the case before him to determine if the offenses are in fact the same.

■ Obviously, the better approach in such a case would be to consider the criminal transactions underlying each of the two indictments. In this regard, the "same evidence test" would merely constitute one of a myriad of elements to be considered by the trial judge in determining whether the conspiracies alleged in the two indictments are one and the same. The ultimate determination would turn upon whether the indictments charge a single conspiratorial agreement, or two entirely independent conspiratorial agreements. *See United States v. Papa,* 533 F.2d 815, 820–22 (2d Cir.), *cert. denied,* 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976).

■ Even under this more fluid test, the initial burden of invoking the doctrine of double jeopardy rests squarely upon the shoulders of the defendant. *United States v. Mallah,* 503 F.2d 971, 986 (2d Cir. 1974), *cert. denied,* 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975). *See also United States v. Papa, supra,* 533 F.2d at 821. Only when the defendant has introduced evidence sufficient to demonstrate that the conspiracies were in fact one, does the burden shift to the government to rebut the inference of unity.

■ Upon close scrutiny of the facts before me, including the two indictments in issue, I find the defendant has failed, at least at this juncture of the prosecution, to sustain its initial burden. More particularly, I find that the alleged "similarities" are individually and collectively insufficient to sustain a finding that the conspiracies alleged are one in the same. For example, the fact that the time frame of the first indictment is totally subsumed into the second, and that the overt acts alleged in each indictment took place predominately in the same cities [10] is far from sufficient to establish the existence of one conspiracy. *United States v. Papa, supra,* 533 F.2d at 821; *United States v. Mallah, supra,* 503 F.2d at 983. Moreover, even assuming that the travel diary in issue would have played a key role in the defendant's conviction in the California action, it is unclear at this point whether the government intends to rely upon the identical entries which would have been germane to the California action. Indeed, a travel diary is by definition an on-going enterprise and could easily contain evidence reflective of any number of separate and distinct events and conspiracies. Finally, the fact that one Gavino Maldonaro Renteria was a co-defendant in the California action and is named as an unindicted co-conspirator in the instant action is not dispositive of there being but one conspiracy. In fact, since only 2 of the 25 indicted and unindicted co-conspirators in the present action, including defendant Lopez, were named in the California indictment, this suggests that the conspiracies may in fact be separate and independent.

Thus, defendant Lopez, has, at this juncture, failed to meet his initial burden of establishing the unity of the conspiracies charged in the two indictments in issue. Accordingly, his motion for dismissal of the indictment based upon the ground of double jeopardy is denied without prejudice to be renewed should it appear on the trial by the evidence introduced and the testimony elicited that the two conspiracies are in fact one in the same.

The balance of motions, excluding severance, are those of defendant Rivera which request an opportunity to inspect the Grand Jury minutes surrounding the instant indictment, a further Bill of Particulars of the indictment and a dismissal of the indictment for alleged violations of the Speedy

---

**10.** Although the California indictment is limited to activities in Los Angeles and New York City, the instant indictment also alleges activities in Mexico, Puerto Rico and Miami, Florida. This, I find, is an additional indication that the two conspiracies in issue were in fact separate and distinct.

Trial Act, 18 U.S.C. §§ 3161–74. These motions are all denied.

 Defendant's request for inspection of the Grand Jury minutes is without merit. He urges that the minutes would aid the Court in determining if the instant indictment subjects him to double jeopardy, was predicated upon the fruits of an unlawful electronic surveillance or was brought in violation of the Speedy Trial Act.

Defendant has alleged no facts sufficient to warrant production of the Grand Jury minutes for inspection by the Court much less by defendant himself. Moreover, defendant cites no authority in support of his request. Consequently the request is denied.

Defendant's motion for dismissal alleging a violation of the Speedy Trial Act is similarly without merit. He alleges merely that since he was arrested in November, 1976, the federal authorities should have known of the charges in the instant indictment as they concern Rivera, and a lapse of two years between this initial arrest by New York authorities and the instant federal indictment constitutes a failure of timely prosecution, mandating its dismissal.

A defendant does not become an "accused" for Speedy Trial Act purposes until he is under federal arrest. *United States v. Lai Ming Tanu,* 589 F.2d 82 at 88 (2d Cir. 1978). Thus, the time spent by Rivera under arrest by New York State officials is clearly not imputed to a federal prosecution for purposes of the Speedy Trial Act.

Moreover, I find no trial prejudice suffered by Rivera as a result of the delay between the state and federal prosecutions. Nor could any be realistically asserted on the facts before me. Thus, the defendant's arguments asserted under the sixth and fourteenth amendments are also unpersuasive and must fail. *United States v. Lai Ming Tanu, supra,* 589 F.2d at 88–90.

Finally, I find that the Bill of Particulars already provided by the Government to Rivera satisfies any obligation they may have to elaborate upon the instant indictment. The balance of the information sought by Rivera is calculated not to elaborate on the indictment, but to discover the theory of the government's case. Thus, it is improper and need not be produced at this time.

Accordingly, all defendants' motions dealt with above are denied.

SO ORDERED.