**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Severo ESCOBAR, Defendant-Appellant.**

**No. 34, Docket 86–1207.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 16, 1986.
Decided Nov. 7, 1986.

Bruce Green, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty. S.D. N.Y., Deborah J. Stavile, Stuart E. Abrams, Asst. U.S. Attys., New York City, of counsel), for plaintiff-appellee.

Paul E. Warburgh, Jr., New York City (Axelrod & Warburgh, New York City, of counsel), for defendant-appellant.

Before LUMBARD, OAKES, and MIN-ER, Circuit Judges.

LUMBARD, Circuit Judge:

On January 23, 1984, Severo Escobar and twelve others were indicted for violations of the federal narcotics laws. As Escobar fled to Colombia before trial, he was tried *in absentia* before Judge Morris E. Lasker and a jury in the Southern District. On July 18, 1984, the jury convicted Escobar of one count of distributing cocaine, and one count of conspiring to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) and § 846 respectively. Colombia extradited Escobar to the United States on February 14, 1986, and, on April 25, Judge Lasker imposed a $25,000 fine on each count and two consecutive fifteen-year sentences. Escobar now challenges his conviction, claiming that the district court erred when it refused to suppress certain evidence seized during searches of Escobar's Miami, Florida apartment on January 13 and 14, 1984. We affirm.

A suppression hearing held by the district court established the following facts. Drug Enforcement Administration (DEA) officials believed Escobar to be a central figure in a sizable cocaine importation and distribution ring. On January 13, 1984, four DEA agents, a New York State law enforcement official, and two Miami police officers proceeded to 1925 Brickell Avenue, Apt. 1406D, Miami, Florida, where Escobar lived with his family including his son-in-law Carlos Alfonso Lopez, armed with arrest warrants for Escobar and Lopez. Escobar does not challenge the validity of the arrest warrants. The agents knocked loudly on the apartment door and identified themselves in Spanish as police. After several minutes of discussion between the agents and the occupants of the apartment, Escobar admitted the agents.

DEA Agents James Greenan and James Shedd, and Miami Police Officer Fidel Mata then arrested Escobar in the entryway of the apartment. Escobar was read his rights in Spanish, and nodded affirmatively when asked if he understood his rights. The other agents fanned out to search for Lopez and anyone else who might pose a threat to the agents or destroy evidence. Lopez was not in the entryway when the agents entered the apartment. Agent James Shedd testified that he first noticed Lopez coming out of the living room after

Escobar had been arrested. The agents then placed Lopez under arrest, handcuffed him, and read him his rights.

Investigator John McGivern of the New York State Police, upon entering the apartment, proceeded directly to a bedroom at the end of the hallway, apparently attracted by light and noise. He found two women, later identified as Mrs. Escobar and Mrs. Lopez, in the bedroom. McGivern also checked an adjacent bathroom and a closet for anyone who might be hiding there. On the floor of the closet, he saw a submachine gun along with other guns. McGivern confiscated the submachine gun and, stepping out of the bedroom, showed it to Agent Greenan, who was still at the other end of the hallway with Escobar and Agent Shedd.

After ordering the two women to be removed and the bedroom secured, Agent Greenan, using Agent Shedd as an interpreter, asked Escobar if there were any other guns in the apartment. Escobar stated that there were. When Greenan asked where, Escobar took Greenan and Shedd into the bedroom and pointed beneath the bed. A loaded shotgun and several handguns were found under the bed. The agents took possession of these guns, the additional guns from the closet, and a large amount of ammunition.

While in the bedroom with Escobar, Agent Greenan noticed an envelope imprinted with the logo "Corintex" in large block letters on the nightstand. Greenan knew that "Corintex" was the name of a company used by one of Escobar's codefendants to import cocaine and launder money. Several papers were protruding from the envelope and other papers were partly under the envelope but "exposed to view for the remainder of their surface." Greenan observed various markings on these papers including "K–5" and "LTD". Similar markings had been found on 24 kilograms of cocaine that Greenan had seen delivered to a government informant in New York on November 25, 1983. Agent Greenan also saw a personal telephone book opened to a page containing codefendant Eduardo Mera's beeper telephone number. Greenan confiscated the envelope, the coded papers, and the telephone book.

While McGivern and Greenan were in the bedroom, other agents requested Escobar's permission to search the apartment. Escobar responded, "If it's a matter of staying here handcuffed for the next eight hours, yes, go ahead and search this apartment." Nevertheless, the agents decided to get a search warrant. After telephoning a number of Assistant United States Attorneys in an attempt to obtain a telephonic search warrant, pursuant to Fed.R.Crim.P. 41(c)(2), Greenan was informed that such a procedure was not used in the Southern District of Florida. McGivern and another agent then went to see Assistant United States Attorney Robert Litman, who was on duty that night.

Agent Greenan remained at Escobar's apartment to prevent the destruction of evidence. McGivern later telephoned Greenan and told him that it would take some time to get a search warrant because no magistrate was on duty that night. The agents then removed Escobar and Lopez from the apartment. At about 2:30 A.M. on January 14, Greenan left the apartment with the confiscated papers and weapons after McGivern returned, having failed to obtain a search warrant.

At 7:45 P.M. on January 14, 1984, the agents obtained a search warrant for Escobar's apartment. The affidavit supporting the issuance of the warrant relied in part on certain evidence seized during the previous evening's search. The agents then returned to Escobar's apartment about 9:00 P.M. to execute the warrant, and seized various records, including a ledger containing accounts of drug deals, handwritten notations concerning cocaine shipments and distributions, bank records and checks.

Prior to trial, Escobar moved to suppress, among other things, the evidence seized during the January 13 and 14 searches. Escobar supported his motion with a lawyer's hearsay affidavit, and the unsigned, unadopted affidavit of Lopez.

Lopez also filed an identical motion on his own behalf. Before Lopez signed his affidavit in support of Escobar's motion to suppress, Judge Lasker ruled that the affiant would not be afforded protection for statements in the affidavit under *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), and consequently those statements could be used against him at trial. Lopez then withdrew his affidavit in support of Escobar's suppression motion. Judge Lasker nevertheless held a suppression hearing, at which five agents testified and were cross-examined by Escobar's attorney, and ruled that the evidence seized during the two searches was admissible.[1]

██ Judge Lasker upheld Officer McGivern's seizure of the submachine gun after concluding that the agents "appropriately made a preliminary search with regard to securing the premises." Escobar argues that the "sweep search" was not justified because the agents had no reason to believe that Escobar or Lopez were dangerous. We disagree. Law enforcement officers may conduct a security check—a quick and limited pass through the premises to check for third persons—without a warrant when making an arrest on private premises when they reasonably fear that other persons are lurking within who may pose a threat to their safety or are likely to destroy evidence, *United States v. Manley*, 632 F.2d 978, 986–87 (2d Cir.1980), *cert. denied*, 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981); *see also Payton v. New York*, 445 U.S. 573, 589, 100 S.Ct. 1371, 1381, 63 L.Ed.2d 639 (1980); *United States v. Jackson*, 778 F.2d 933, 936–37 (2d Cir. 1985), *cert. denied*, — U.S. —, 107 S.Ct. 308, 93 L.Ed.2d 282 (1986); *United States*

*v. Agapito*, 620 F.2d 324, 336 (2d Cir.), *cert. denied*, 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980),[2] even though generally they may not constitutionally search a dwelling without first obtaining a search warrant, *Vale v. Louisiana*, 399 U.S. 30, 34, 90 S.Ct. 1969, 1971, 26 L.Ed.2d 409 (1970); *United States v. Reed*, 572 F.2d 412, 413 (2d Cir.), *cert. denied*, 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978). If their presence is lawful, law enforcement officers may justifiably seize "items observed in plain view during the security check." *United States v. Gomez*, 633 F.2d 999, 1008 (2d Cir.1980), *cert. denied*, 450 U.S. 994, 101 S.Ct. 1695, 68 L.Ed.2d 194 (1981).

██ In the instant case, the agents had reason to believe that third persons were present on the premises. When McGivern proceeded back to the bedroom, Lopez had not yet been arrested. Moreover, the light and sound coming from the bedroom warned the agents that third persons might be present. Thus, we are not faced with a situation like *Agapito, supra*, where the law enforcement agents undertook a warrantless search despite the fact that they knew, from days of surveillance, that no third persons were present who might have posed a danger to evidence or to the officers' safety. As the agents reasonably believed third persons to be present, they were entitled to protect evidence from destruction and themselves from a surprise attack by locating and monitoring those persons. Obviously, the searches were wise precautions in view of the firearms and ammunition eventually confiscated. The agents also properly seized the guns under Escobar's bed which Escobar had pointed out to the agents.

---

1. Accordingly, we need not consider the government's argument that Escobar waived any challenge to the searches by failing to submit an affidavit from an individual "with personal knowledge" in support of his suppression motion.

2. As Justice White recently noted, *United States v. Jackson*, — U.S. —, 107 S.Ct. 308, 93 L.Ed.2d 282 (1986) (dissenting from denial of certiorari), while some circuits have imposed a

requirement that the officers have knowledge that other persons on the premises might be dangerous before they undertake a "security sweep," *see, e.g., United States v. Kolodziej*, 706 F.2d 590, 596–97 (5th Cir.1983); *United States v. Hatcher*, 680 F.2d 438, 444 (6th Cir.1982), our cases only require that the officers have a reasonable belief that a third person might be on the premises, *United States v. Jackson*, 778 F.2d at 937.

■ We agree with the district court that the agents properly seized the papers from Escobar's nightstand under the plain view doctrine. The seizure of these documents met the requirements we articulated in *United States v. $10,000 in United States Currency*, 780 F.2d 213, 217 (2d Cir.1986): (1) the initial intrusion must be supported by a search warrant or by a recognized exception to the warrant requirement; (2) the discovery of the evidence must not have been anticipated at the time of the initial intrusion; and (3) the incriminating nature of the evidence must be immediately apparent. *See also Texas v. Brown*, 460 U.S. 730, 737, 103 S.Ct. 1535, 1540, 75 L.Ed.2d 502 (1983) (opinion of Rehnquist, J.); *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (plurality opinion). As we have pointed out, the initial intrusion was lawful. Turning to the second prong, Agent Greenan could not have anticipated the discovery of the papers. Finally, Agent Greenan's knowledge of the relationship between the evidence seized and the cocaine conspiracy, gleaned through months of investigation, gave him probable cause to believe that the papers were evidence of a crime. *Texas v. Brown*, 460 U.S. at 734, 103 S.Ct. at 1539; *United States v. $10,000 in United States*, 780 F.2d at 220. The seizure therefore satisfied all the requirements of the plain view doctrine.

As we hold that the search and seizures made on January 13 were lawful, it follows that Escobar's challenge to the search and seizure made under the warrant issued on January 14, largely in reliance on evidence seized on January 13, must also fail.

Affirmed.