UNITED STATES of America, Plaintiff,

v.

Julio LARRACUENTE, Sara Feldman, also known as "Sara Frajberg", and Jose DeGracia, Defendants.

No. 90–CR–207 (ADS).

United States District Court, E.D. New York.

June 25, 1990.

Andrew J. Maloney, U.S. Atty., E.D.N.Y. by Jeffrey Toobin, Asst. U.S. Atty., Brooklyn, N.Y., for plaintiff.

Siegert & Choe, New York City (Paul W. Siegert, of counsel), for defendant Julio Larracuente.

## MEMORANDUM DECISION AND ORDER

SPATT, District Judge.

The defendant Julio Larracuente ("Larracuente"), moves for an order seeking the following relief: (1) a bill of particulars pursuant to Fed.R.Crim.P. 7(f); (2) severance from his co-defendants pursuant to Fed.R.Crim.P. 12(b)(5) and 14; and, (3) suppression of physical evidence pursuant to Fed.R.Crim.P. 41(f). For the following reasons, branch (1) is denied, branch (2) is denied as moot, and branch (3) is granted in part and denied in part.

## FACTUAL BACKGROUND

The Motion Picture Association of America, Inc. ("MPAA"), is an organization which, among other functions, investigates the sale, purchase and/or production of illegal or "bootleg" videocassettes (Ferbrache Aff't ¶ 7). Bootleg videos are typically produced by duplicating legitimate copyrighted films, without the authorization or consent of the copyright holder (Ferbrache Aff't ¶ 6). Counterfeit surface and spine labels are also created which are then placed upon the infringing videocassette and its cardboard or plastic case (id.).

In late 1988, the MPAA was advised by an informant that a store called Video Latino, 928 Broadway, Queens, New York, which is owned by Larracuente, was selling bootleg videos with counterfeit labels (Ferbrache Aff't ¶ 8). The informant also stated that Larracuente owns a store called "The Record Shop", at 922 Broadway, Brooklyn, New York, where he believed these bootleg videos were being manufactured (Ferbrache Aff't ¶ 8). This information was initially provided over the telephone, and later reduced to a handwritten note sent to the MPAA (Ferbrache Aff't ¶¶ 8–9). Although the informant identified himself by name as "Victor Victoria", his address and telephone number were withheld (Ferbrache Aff't ¶ 8).

Subsequently, in August of 1989, the MPAA received another telephone call, wherein the anonymous caller stated that Video Latino was selling bootleg videos (Ferbrache Aff't ¶ 10). This conclusion was apparently based upon the fact that the videos were of a low quality, and also that the store had in stock the video "Who Framed Roger Rabbit?", well before its official release date (id.).

Based upon the foregoing information, the Federal Bureau of Investigation ("FBI") commenced an investigation. After initially renting 64 videocassettes and determining that at least 35 of them were illegal "bootleg" copies, the FBI undertook a surveillance of the Video Latino premises in November of 1989 (Ferbrache Aff't ¶¶ 11–12).

During the surveillance, Larracuente was first observed leaving the Video Latino early one evening in a Toyota truck with New Jersey license plates. He drove to a store known as "Aspen Video", where he delivered a large cardboard box (Ferbrache Aff't ¶¶ 11–13). Larracuente then left Aspen Video and drove to a two-story house at 62–65 Forest Avenue, Queens, New York.

Following this first observation of transporting large cardboard boxes, the FBI observed Larracuente on several other occa-

sions transporting the same type of boxes between the Video Latino, the 62–65 Forest Avenue premises, and The Record Shop (Ferbrache Aff't ¶¶ 14–22). Some of these boxes were marked with the name "BASF", which is a well-known, large-scale manufacturer of unrecorded or "blank" videocassettes (Ferbrache Aff't ¶ 20).

As detailed in Agent Ferbrache's affidavit in support of the search warrant, in addition to the above, the investigators had purchased numerous bootleg videos from co-defendant Sara Feldman, who is alleged to have operated the Video Latino store (Ferbrache Aff't ¶ 23–29). A total of approximately 490 bootleg videocassettes were purchased from Feldman from December, 1989 through February, 1990 (Ferbrache Aff't ¶ 29).

Agent Ferbrache asserts that in his experience of investigating videocassette bootleg operations, such large cardboard boxes "are frequently used to transfer Bootleg Videos from the 'lab' at which they are produced to their destinations, which are generally video stores or distributors" (Ferbrache Aff't ¶ 13).

Based upon the extensive investigation as detailed in Agent Ferbrache's affidavit in support, Magistrate A. Simon Chrein issued the search warrant on February 14, 1990, which was executed the next day by three FBI Special Agents, including Ferbrache, two FBI Clerks and two MPAA representatives.

The search warrant specifically authorized the search of:

"THE PREMISES KNOWN AND DESCRIBED AS THE FIRST FLOOR OF A TWO–STORY HOUSE LOCATED AT 62–65 FOREST AVENUE, QUEENS, NEW YORK."

The property reasonably believed to have been concealed on the premises, is described in the warrant as follows:

"Unauthorized and infringing copies of copyrighted movies; counterfeit labels, be they loose or affixed to such movies, and counterfeit sleeves to contain such movies (such copies, labels and sleeves collectively referred to hereafter as "Bootleg Videos"); video cassette record-ers, video enhancers, video stabilizers and other equipment used in making Bootleg Videos; proceeds from the sale of Bootleg Videos; records relating to the manufacture, purchase, sale and production of Bootleg Videos, including, but not limited to invoices, receipts and ledgers; records relating to income derived from the manufacture, purchase, sale and production of Bootleg Videos, including but not limited to bank statements and tax returns; and records relating to the identities of persons involved in the manufacture, purchase, sale and production of Bootleg Videos, all constituting evidence of violations of Title 17, United States Code, Section 506."

According to the Government, upon executing the warrant on February 15, 1990, "[t]he search revealed extensive evidence of an active counterfeiting lab" (Government's Memorandum of Law at p. 5). The Agents found approximately 78 professional videocassette recorders and assorted technical equipment, as well as over 1,600 bootleg videocassettes. In addition, the Agents found a .25 caliber semi-automatic handgun on the top shelf of a closet in the master bedroom on the second floor of the premises.

Larracuente now moves for a bill of particulars, severance, and suppression.

## THE MOTIONS

### 1) *Bill of Particulars:*

Larracuente requests the Court to direct the Government to furnish him with a bill of particulars pursuant to Fed.R.Crim.P. 7(f). Specifically, he seeks "the names of any other alleged co-conspirators, whether indicted or unindicted, the dates when this defendant allegedly joined the conspiracy, and the location of any meetings" (Siegert Affirmation at p. 7). In opposition, the Government alleges that these requests are improper, insofar as they are merely a ruse "to obtain information that is not available under Rule 16 of the Federal Rules of Criminal Procedure" (Government's Memorandum of Law at p. 12).

Rule 7(f) provides that "[t]he court may direct the filing of a bill of particulars". It is well settled, however, that whether or not a bill should be granted lies "within the sound discretion of the district court" (*United States v. Bortnovsky*, 820 F.2d 572, 574 [2d Cir.1987], citing *United States v. Panza*, 750 F.2d 1141, 1148 [2d Cir.1984]). A bill of particulars is not to be viewed as a discovery device to seek and compel disclosure of the Government's evidence prior to trial (*see United States v. Gottlieb*, 493 F.2d 987, 994 [2d Cir.1974]), but rather, its sole purpose is to provide information to the defendant sufficient to advise him of the crimes for which he is charged. So long as the defendant is adequately apprised of the charges contained in the indictment to enable him to prepare his defense or to avoid unfair surprise at trial, a bill should not be granted (*see United States v. Matos–Peralta*, 691 F.Supp. 780, 791 [S.D.N.Y.1988]).

The Second Circuit recently upheld the district court's denial of a bill of particulars where the defendant sought precisely the same information as that sought here: namely, the identity of other persons in the conspiracy; the approximate date when the defendant was alleged to have joined the conspiracy; and the precise dates, times and locations relevant to the charges against the defendant in the indictment (*see United States v. Torres*, 901 F.2d 205 [2d Cir.1990]). In rejecting the defendant's application, Judge Mahoney provided an instructive review of the function and scope of a bill of particulars:

> " 'The function of a bill of particulars is to provide defendant with information about the details of the charge against him if this is necessary to the preparation of his defense, and to avoid prejudicial surprise at trial.' ... 'A bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.' ... 'Whether to grant a bill of particulars rests within the sound discretion of the district court.' ... 'Acquisition of evidentiary detail is not the function of the bill of particulars.' ...

> 'So long as the defendant was adequately informed of the charges against him and was not unfairly surprised at trial as a consequence of the denial of the bill of particulars, the trial court has not abused its discretion.' "

901 F.2d at 234 (citations omitted).

The Court finds that the indictment here adequately advises Larracuente of the specific acts of the crimes for which he is accused of committing, sufficient to prevent unfair surprise at trial. The indictment is not phrased in such general terms as to cause Larracuente unfair surprise at trial. Additionally, the defendant has been already provided with the evidentiary details of the Government's case in discovery disclosures, which include, as acknowledged by counsel for the defendant, "tape recordings of some illegal activities involving an alleged co-conspirator" (Siegert Affirmation at p. 6). Independent of the indictment and discovery, the affidavit of Mark D. Ferbrache, Special Agent of the Federal Bureau of Investigation, in support of the search warrant, provides ample detail of the specific acts underlying the indictment. In this Court's view, compelling the Government to provide the defendant with a bill of particulars under these circumstances would be unwarranted.

Accordingly, Larracuente's motion for a bill of particulars is denied.

### 2) *Severance:*

Pursuant to Fed.R.Crim.P. 14, Larracuente requests a severance of his trial from that of his co-defendants primarily on two grounds: (1) likelihood of prejudicial spillover; and, (2) antagonistic defenses (*see* Siegert Affirmation at p. 6; Defendant's Memorandum of Law at p. 3–4). In opposition, the Government alleges that the defendant's conclusory allegations, without more, are insufficient to sustain the burden of justifying a severance (*see* Government's Memorandum of Law at p. 11). However, since co-defendants Jose DeGracia and Sara Feldman have both entered pleas of guilty, this motion is now rendered moot.

Accordingly, Larracuente's motion for a severance is denied as moot.

3) *Suppression:*

Larracuente moves to suppress physical evidence seized at 62–65 Forest Avenue, Queens, New York, primarily on three grounds. First, he alleges that two errors contained in the affidavit in support of the search warrant application, which transposed the street numbers of the premises to be searched, from "65–62" to "62–65" Forest Avenue, renders the subsequent issuance of the warrant defective. Second, Larracuente alleges that there was insufficient probable cause to support the issuance of the search warrant. Finally, it is alleged that the seizure of the .25 caliber handgun from the top shelf of a closet on the second floor of the premises during the execution of the warrant exceeded the scope of the warrant.

In opposition, the Government contends that: (1) the transposition of street numbers was a mere typographical error and such a technical defect should not void the warrant; (2) probable cause did exist for the issuance of the warrant; and, (3) the handgun was properly seized during a "security check" of the premises.

As set forth below, the Court rejects Larracuente's first two arguments, but grants his motion as to the third. Accordingly, the .25 caliber handgun is suppressed.

a) Identification of Premises to be Searched.

■ The Fourth Amendment requires that a search warrant "particularly describ[e] the place to be searched". In cases where the street number of the premises to be searched is incorrectly set forth in the warrant, courts have generally upheld the ensuing search so long as "the description of the premises to be searched was sufficient to enable those executing the warrant to locate and identify the premises, with reasonable effort" (*United States v. Rivera*, 465 F.Supp. 402, 409 [S.D.N.Y.], *aff'd without opn.*, 614 F.2d 1292 [2d Cir.1979]; *see generally* 2 W. LaFave, *Search and Seizure, A Treatise on the Fourth Amendment* § 4.5(a), at p. 212 [1987] ["the cases reflect an understanding of the fact that errors can easily occur in the use of numbers, such as an apartment or house number, and that it should be presumed that such an error did occur when other descriptive facts fit a different location"]).

Here, the warrant itself stated the correct street address, but the affidavit upon which it was based twice contained an error in the street number. Otherwise the correct address was listed both in the caption and within the affidavit.

In Ferbrache's affidavit in support of his application for the search warrant, the premises were specifically correctly listed in the caption as *"62–65"* Forest Avenue (emphasis supplied). Within the body of the affidavit, two references to the premises under investigation were also listed as *"62–65"* Forest Avenue, Queens (*see* Ferbrache Aff't at pp. 8, 11 [emphasis supplied]). The warrant issued by Magistrate Chrein based upon this application authorized, and twice listed, a search of *"62–65"* Forest Avenue, Queens, which premises were searched the following day. However, in two paragraphs of the affidavit in support, the premises were listed as *"65–62"* Forest Avenue, Queens (*see* Ferbrache Aff't at pp. 2, 17 [emphasis supplied]).

Larracuente argues that this transposition of numbers in the two paragraphs of the affidavit should render the ensuing search warrant fatally defective, since no probable cause has been established to justify a search of *62–65* Forest Avenue (*see* Siegert Affirmation at p. 3). Therefore, according to Larracuente, all of the evidence seized at 62–65 Forest Avenue should be suppressed.

In *United States v. Christopher*, 546 F.2d 496, 497 (2d Cir.1976), the defendant challenged the issuance of a search warrant for "Room 1334" of a particular apartment building. In one sentence of the underlying affidavit, the premises were described as "Room 1334", otherwise the affidavit made it clear that the intended premises were in fact "Room 1332". The Government searched "Room 1332", rath-

er than "Room 1334" as listed on the warrant, and seized various physical evidence.

Aside from finding that the defendant lacked standing to challenge the search of Room 1332, the Court noted that in any event the search warrant was not defective:

> "[T]he transposition of room numbers was clearly accidental. There was no question but that the room which was intended to be the object of the search and which was searched was Room 1332."

546 F.2d at p. 497, citing *United States v. Campanile*, 516 F.2d 288, 291 (2d Cir. 1975).

The Court rejects Larracuente's argument that the transposition of numbers in the search warrant application at issue renders the warrant defective. A reading of the entire affidavit indicates that no confusion existed as to the premises to be searched. The caption of the affidavit listed *62–65* Forest Avenue. The affidavit itself contained several allegations as to *62–65* Forest Avenue. The search warrant issued by Magistrate Chrein listed *62–65*, twice. Agent Ferbrache undertook the surveillance and investigation of 62–65 Forest Avenue as stated in his affidavit. It was he, along with six others, who undertook the search at *62–65* Forest Avenue. There is no evidence of any confusion whatsoever as to the premises under surveillance and subsequently searched.

In sum, there can be no real doubt as to which of the two premises was under investigation. The apparently inadvertent transposition of street numbers in two places in the affidavit is a mere technical defect that should not void the issuance of the warrant, especially where, as here, the executing officer is also the affiant who applied for the warrant (*see* 1 W. Ringel, *Searches & Seizures, Arrests and Confessions* § 5.5(a), at p. 5–22.3 [1990]).

Accordingly, Larracuente's motion to suppress on the ground that the search warrant is void by reason of the transposition of street numbers in the application, is denied.

b) Probable Cause.

It is a constitutional mandate that no search warrant shall issue without probable cause. This proscription "has roots that are deep in our history" (*Henry v. United States*, 361 U.S. 98, 100, 80 S.Ct. 168, 170, 4 L.Ed.2d 134 [1959]). In order to determine whether probable cause exists for the issuance of a search warrant, as Judge Altimari of this Circuit recently noted, the applicable standard is as follows:

> "Under *Illinois v. Gates*, 462 U.S. 213 [103 S.Ct. 2317, 76 L.Ed.2d 527] (1983), probable cause for a search warrant is established if the 'totality-of the-circumstances' indicate a probability of the criminal activity. *Id.* at 230–232 [103 S.Ct. at 2328–2329]. '[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.'"

*United States v. Rowell*, 903 F.2d 899, 902 (2d Cir.1990).

In reviewing the issuance of a search warrant, it is well settled that the Magistrate's finding of probable cause is to be accorded "substantial deference" (*see United States v. Travisano*, 724 F.2d 341, 345 [2d Cir.1983]).

Applying these principles to the facts of this case, the Court finds that the search warrant was not improvidently issued by Magistrate Chrein and was based upon sufficient probable cause.

The investigation began after receiving "tips" from two independent informants. The investigators rented 64 tapes from Video Latino, 35 of which were "bootlegs". They later purchased approximately 490 bootleg videocassettes over a three-month period, but only after an extensive surveillance of The Record Shop, the Video Latino and 62–65 Forest Avenue. The defendants were frequently observed transporting large cardboard boxes, some with the name "BASF", back and forth from Video Latino and The Record Shop, to 62–65 Forest Avenue. Finally, based upon Ferbrache's experience in investigating the bootleg videocassette industry, he concluded that such

actions by Larracuente and the co-defendants, along with the activity occurring at 62–65 Forest Avenue, is consistent, if not indicative, of illegal activity.

Based upon the extensive investigation, surveillance and information gathered by the FBI as set forth in Agent Ferbrache's detailed affidavit presented before Magistrate Chrein, it cannot be said that the warrant was issued without probable cause. Viewing the totality of circumstances gleaned from the search warrant application, the activities of Larracuente at 62–65 Forest Avenue indicate a probability of criminal activity. Accordingly, Larracuente's motion to suppress on the ground that no probable cause existed for the issuance of the warrant, is denied.

c) The Handgun.

■ The search warrant specifically authorized a search of "the *first* floor of a two-story house located at 62–65 Forest Avenue" (emphasis supplied). In his descriptive report following the search, Special Agent Kevin O'Grady described the search of the *second* floor, as follows:

"During a *search* of the *upstairs master bedroom*, a handgun and ammunition were found. Those items were then seized. Details regarding the discovery of those items is as follows:

On the top shelf of a closet in the corner of the bedroom, with its door open, and in clear view *when standing in the bedroom*, was a .25 caliber semi-automatic handgun. After observing the handgun while standing in the room, the investigating Agent went to the handgun and examined it. The handgun was found to be a Raven Arms model MP–25 semi-automatic pistol, loaded with a magazine, with a round chambered, and the safety on. Next to the handgun on the top shelf of the closet was a loaded banana magazine.

While *continuing* the *search of the closet,* a white plastic bag was observed."

O'Grady Report dated February 21, 1990, at p. 1 (emphasis supplied).

The purported justification for this search and seizure is "a protective sweep of the house, accounting for all individuals present at the residence" (O'Grady Report dated 2/26/90, at p. 1), for which the Government relies on the authority of *United States v. Escobar,* 805 F.2d 68, 71 (2d Cir.1986).

As stated above, there exists the constitutional requirement that the warrant "particularly describ[e] the place to be searched". The underlying purpose is to define the legal boundaries of the authorized search. If, for example, a warrant specifically authorizes the search of the first floor of a particular premises, like here, then it is improper to search the second floor in the absence of a recognized exception to the warrant requirement (*see* 2 W. LaFave, *Search and Seizure, A Treatise on the Fourth Amendment* § 4.10[a], at p. 314 [1987]). Thus, the issue presented here is whether the search of the closet of the master bedroom on the second floor comes within an exception to the warrant requirement.

In *Escobar,* the court held that once lawfully in the place to be searched, the executing officers may conduct a security sweep to look for persons who might destroy evidence or pose a threat to the officers' safety. Any evidence found during the course of this security sweep will not be suppressed, the justification being that although the officers may not "search" for evidence, they may seize objects found in plain view (*see United States v. Londono,* 659 F.Supp. 758, 762 [E.D.N.Y.1987]).

Special Agent O'Grady admits in his report, however, that this was a "search", rather than a "security sweep". In fact, after the gun and ammunition were found on the top shelf, the agents "continu[ed] the search of the closet" (O'Grady Report dated Feb. 21, 1990, at p. 1). Even assuming that the officers' presence on the second floor was justified, and that the closet door in the master bedroom was open, after ascertaining that there were no persons who might have been "lurking" about, there was no justification for the continued search of the closet. This is clearly beyond the scope of a security sweep. There was nothing in the factual scenario at issue that

could reasonably support the conclusion that the officers reasonably feared that others would be "lurking" in the house who might pose a threat to their safety, or that there was a likelihood that evidence would be destroyed (*see Escobar*, 805 F.2d at p. 71).

In addition, the Government does not claim, nor do the facts support a finding, that once in the house, exigent circumstances arose. In sum, the Court finds that the "search" of the closet was not "a quick and limited pass through the premises to check for third parties" (*id.*), but rather an unauthorized search violative of the Fourth Amendment.

Accordingly, Larracuente's motion to suppress the evidence seized from the top shelf of the closet in the master bedroom on the second floor, is granted. The Court finds that the search was not only beyond the scope of the warrant issued, but also that it exceeded the type of "security sweep" envisioned by *Escobar* and was not within the purview of the "plain view" doctrine (*see United States v. Jenkins*, 876 F.2d 1085, 1088 [2d Cir.1989]).

## CONCLUSION

Based upon the foregoing, the defendant's motion for a bill of particulars is denied, as is his motion for a severance. The defendant's motion to suppress all physical evidence seized from the 62–65 Forest Avenue premises is denied, except that it is granted to the extent that the evidence seized from the closet of the master bedroom on the second floor is suppressed.

SO ORDERED.